288 F.2d 336
 61-1 USTC P 9344
 BILTMORE HOMES, INC., Charles F. Cooper, Charles F. Cooper
and Virginia P. Cooper, Frank B. Cooper, Frank B.
Cooper and Jean R. Cooper, James Cooper
and Betty D. Cooper, and James
Cooper, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 No. 8246.
 United States Court of Appeals Fourth Circuit.
 Argued Jan. 18, 1961.
Decided March 27, 1961.
 
 Charles F. Cooper and E. W. Mullins, Columbia, S.C. (Nelson, Mullins & Grier, Columbia, S.C. on brief), for petitioners.
 James P. Turner, Attorney, Department of Justice, Washington, D.C. (Charles K. Rice, Asst. Atty. Gen., and Lee A. Jackson and A. F. Prescott, Attorneys, Department of Justice, Washington, D.C., on brief), for respondent.
 Before SOPER, HAYNSWORTH and BOREMAN, Circuit Judges.
 SOPER, Circuit Judge.
 
 
 1
 The principal question with which we are concerned in these consolidated cases grows out of the activities of three brothers residing in Columbia, South Carolina, in connection with a local housing development under the Federal Housing Administration. The three men, Frank B. Cooper, Charles F. Cooper, and James D. Cooper, formed the Biltmore Homes, Inc. under the laws of South Carolina on September 17, 1946. The capital stock of the corporation, consisting of 5,000 shares with a par value of $1 per share, was subscribed and paid for in equal shares by the three men. The officers of the corporation from its inception to its dissolution on September 1, 1948, were Frank, its president, and James, its vice president, secretary and treasurer. Frank was in charge of the operations of the corporation.
 
 
 2
 In 1946, Biltmore acquired several tracts of real estate including lots in a subdivision called 'Oakhurst' for which it paid $48,950. During the taxable period it made use of this property in a building operation under the Federal Housing Administration.
 
 
 3
 The three brothers were also actively engaged in a number of other business enterprises for profit, either singly or together, most of which were incorporated. Of especial importance in connection with the Biltmore housing operation were two corporations in the finance and mortgage field, to wit: Perpetual Building and the Mutual Savings and Loan Company. and the Mutual Savings and Oan Company. Both corporations were organized under the laws of South Carolina. The officers of Perpetual were Charles, president; Frank, vice president; and James, treasurer. Charles was in charge of the operations of Perpetual. He is a lawyer any he appeared for the taxpayers in these cases in the Tax Court and also in this court. James was the president of Mutual and was in charge of its operations. His brothers were shareholders in the corporation. Both Perpetual and Mutual had been held to be exempt from federal income taxes during the taxable years by rulings under the provisions of 101(4) of the Internal Revenue Code of 1939, 26 U.S.C.A. 101(4). Because of this fact the brothers conceived the idea that it would be desirable to conduct the Biltmore housing operations in such manner that the profits would find their way into the hands of Perpetual or Mutual or both, and it is their contention in this litigation that they were successful in this endeavor. With this end in view they caused the three corporations-- Biltmore, Perpetual and Mutual-- to engage in the following transactions.
 
 
 4
 On March 15, 1947, Biltmore, acting through Frank, its president, entered into an agreement with one Simon Faust, a building contractor, for the construction of ninety-four houses (with extras) on the Oakhurst tract for $5,100 per house. This agreement, together with an estimate of the cost of each house in the sum of $5,352.25 (including landscaping, water connections, FHA fees, insurance, sales expenses and so forth) and the cost of each lot in the sum of $900, or an aggregate cost of $6,252.25 for each house and lot, were filed with the Federal Housing Administration in order to obtain an insured mortgage for 90 per cent of the estimated cost of the project.
 
 
 5
 In order to pay Faust the agreed sum of $5,100 per house, the agreement provided that Biltmore should give to Perpetual, of which Charles was president, a note and mortgage on FHA forms on each of the lots and the improvements thereon so that FHA insurance could be obtained. Biltmore also agreed to assign irrevocably the proceeds of the loan for the account of Faust to the extent of $5,100 per house. It was, however, expressly provided that Faust should be paid nothing until completion and until after the mortgage in each ease had been insured by FHA and all the moneys due by Faust for labor and materials and construction had been paid. James, the president of Mutual, assisted his brother Frank in these transactions with Faust.
 
 
 6
 It clearly appears from closely following events that the estimate of the cost of the houses filed by Biltmore and Faust was excessive and that Faust was entirely willing to build the houses for much less than $5,100 per house. It was also clear that the brothers had no difficulty in arranging to finance the building operation during he period of construction. On April 1, 1947, only seventeen days after Faust agreed with Biltmore to build the houses for $5,100 each, he entered into an agreement with Mutual to build the same houses for $4,000 each. This agreement was signed on behalf of Mutual by James, its president. It provided that Faust might obtain construction money by giving his note for $376,000 ($4,000 per house)[1] secured by a mortgage on the improvements to be erected and on the supplies placed on Oakhurst and other properties of Biltmore and of Faust and by all amounts due to Faust under the contract. The balance due by Faust at any time was to be all the amounts furnished by Mutual, Biltmore or Perpetual. The last two corporations did not agree to make advances to Faust during the construction of the buildings but the mention of them in this connection in the agreement gives evidence of the close relationship between them in carrying out the building operation.
 
 
 7
 On April 10, 1947, ten days after the agreement between Faust and Mutual was signed, Biltmore, in accordance with its agreement with Faust, executed and delivered to Perpetual ninety first mortgages on ninety lots and the improvements to be later erected thereon in Oakhurst in the aggregate sum of $472,900. Therein it was agreed that Biltmore was to receive the difference between $5,100 per house to be paid to Faust and the face amount of the first mortgage on each lot and that Perpetual would finance the sales of the properties to veterans and that the veterans would assume the first mortgage and execute second mortgages for the 10 per cent down-payment plus the closing costs and so forth.
 
 
 8
 Faust built ninety houses on the Oakhurst tract in 1947. It appears, however, that he was paid only $4,000 per house, as provided in his agreement with Mutual and not $5,100 per house as provided in his agreement with Biltmore. Attached to the Mutual agreement in evidence is a schedule of payments made to Faust entitled 'Receipts by and for Account of Simon Faust of Proceeds of Note and Mortgage to Mutual Savings and Loan Company'. The schedule lists payments in varying amounts from April 1 to October 24, 1947, in the aggregate sum of $359,966.81, that is, approximately $360,000 for ninety houses. The schedule also shows that all of the moneys were paid by (or through) one or the other of the three brothers, most of them by James and Frank, a few by Charles.
 
 
 9
 All of the houses and lots were sold to veterans in 1947 for a total of $542, 051. The veterans assumed the first mortgages given by Biltmore to Perpetual in the sum of $472,900 and gave second mortgages in the sum of $68,713.50 and paid $437.50 cash for each house. The first mortgages were insured by FHA. They were sold by Perpetual for their face value between September 3, 1947 and April 28, 1948. The second mortgages were credited by Perpetual to Biltmore in the sum of $33,838.45, which Biltmore agreed was their reasonable value.
 
 
 10
 Biltmore reported no net income in its income tax return for 1947 and reported $347.33 for 1948. The Commissioner determined deficiencies for these years in the amount of $101,788.01 and $5,429.08, respectively. The Tax Court, finding increases in the cost of the lots, reduced these figures to $98,453.75 in 1947 and $468.59 in 1948.
 
 
 11
 The Commissioner also determined that in 1947 and 1948 Biltmore's income was diverted to other corporations (Mutual and Perpetual) in the amount of $90,813.34 and $10,355.59, respectively, for the benefit of Biltmore's three stockholders and charged each of them with one-third of these amounts as dividends. The Tax Court redetermined these dividends in slightly less amounts.
 
 
 12
 The correctness of the determinations of the Commissioner and the Tax Court as to the tax liabilities of Biltmore and of the three brothers in these respects depends upon the cost incurred in erecting the houses. Biltmore deducted $5,100 per house, or a total of $459,000 as the cost of the ninety houses. The Commissioner determined that the total cost was only $4,000 per house, or $360,000 in all. Under the established rules the determination of a deficiency by the Commissioner is presumptively correct and the determination of factual issues by the Tax Court must be sustained by a reviewing court unless it is clearly erroneous. Helvering v. National Grocery Co., 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346. In the instant cases the weight of the evidence with respect to the cost of the houses shows that the determination was correct. Obviously the three brothers embarked upon the housing project to earn a profit for themselves and were desirous of cutting the construction costs to a minimum; and it is an entirely reasonable inference that they knew from the beginning that Faust was willing to undertake the operation for $4,000 per house and that the sum of $5,100 set out in the original agreement between Biltmore and Faust was entirely fictional. The probative force of the chronology of events is overwhelming. On March 15, Faust agrees with Biltmore to build the houses for $5,100 per house and Biltmore agrees to secure the payment by giving a martgage, but only upon the condition that Faust is not to be paid any money until the houses are finished. On April 1, Faust agrees with Mutual to build the same houses for $4,000 per house and Mutual agrees to furnish the necessary money in consideration of the execution of a mortgage by Faust upon the houses which Faust does not own and upon building supplies belonging to him on the Biltmore properties or elsewhere. Mutual got no title to the real estate or to the houses upon completion. Its only interest on the face of the agreement was to lend the money at 6 per cent interest, and the cost of the houses was material only to fix the maximum amount of the loan at $376,000. Under the agreement Mutual was to receive no other money in the transaction than the repayment of the loan with interest.
 
 
 13
 It is significant, as indicating that all of the agreements in the series were parts of a single transaction, that Biltmore did not execute its mortgage to Perpetual until April 10, after Faust had made the agreement with Mutual. The fact that the brothers controlled the operations of all three corporations involved emphasizes the absurdity of two prices by the same builder for the same work. The only reasonable explanation is that ny a complicated course of transactions they hoped to make it appear that one or the other or both of the tax exempt corporations received the profit so that it might escape taxation altogether. Under these circumstances the tax authorities were justified in concluding that the profits found their way into the pockets of the promoters and were diverted for their benefit to other projects in which they were interested.
 
 
 14
 The taxpayers do not offer any reasonable explanation. Their defense consists in part of incredible testimony and in part of deliberate suppression and concealment of the facts. Only one of the brothers testified while the others remained discreetly silent. Faust was dead at the time of the hearing, but that is of little importance in this connection, for it is admitted that he only received $360,000 for building ninety houses. The question is: Who got the profit of $99,000?
 
 
 15
 Frank, the president of Biltmore, testified that Biltmore did not get it. He said that so far as he knew the $5,100 per house was paid to the contractor or to the construction lender. The first statement cannot be accepted for it is contrary to an express admission in the brief filed for him and his brothers in this case. The second statement cannot be accepted for it is inconsistent with the agreement between Faust and Mutual under which Mutual was to be paid only the moneys which it advanced to Faust. At another point in his testimony, when asked how he knew tha Biltmore ever paid $5,100 per house at any time for any purpose. Frank replied: 'I am pretty sure that Perpetual Building and Loan paid it to Faust or Mutual Savings and Loan. I did not have any direct knowledge of it, but I am pretty sure of that being the case'. Upon this evidence alone the taxpayers now make the flat contention that Mutual, a tax exempt corporation, received the difference between $4,000 and $5,100 per house, or a total of $99,000 for advancing the money to Faust during the construction.
 
 
 16
 The Tax Court rejected this testimony as incredible. We are of the opinion that its conclusion was amply justified not only because of the palpable inadequacy of the evidence on the taxpayer's behalf but because of the deliberate suppression of testimony easily available to them. There can be no doubt whatever that James and Charles knew what became of the $5,100 per house and what became of the $99,000 profit in the transaction; but neither of them testified. James was the president of Mutual and could have testified with certainty whether Mutual received the money; but James was silent. Charles was the president and operator of Perpetual which sold the first mortgages for their face value and received the money, which included the profit of $99,000. He must know to a certainty what Perpetual did with the money and what corporation or individual received the profit in the transaction, yet Charles remains silent as a witness. He appears only as a lawyer for himself and his brothers in this case and contents himself with specious argument rather than disclosure of the true facts. This conduct on the part of a member of the bar and an officer of this court needs no characterization from us. It speaks for itself. The conclusion that Biltmore, the corporation, owned by the three brothers received the profit from the building operations must be approved.
 
 
 17
 The additional determination that the three brothers themselves received taxable income from Biltmore in 1947 and 1948 is likewise supported by the evidence set out above. It is of no importance that the income did not pass through their hands, if such be the fact, for if it was diverted at their behest into the hands of others, it was nevertheless taxable to them. As was said in Clark v. Commissioner, 9 Cir., 266 F.2d 698, 711:
 
 
 18
 'To constitute a distribution taxable as a dividend, the benefit received by the shareholder need not be considered as a dividend either by the corporation or its shareholders, declared by the board of directors, nor other formalities of a dividend declaration need be observed, if on all the evidence there is a distribution of available earnings or profits under a claim of right or without any expectation of repayment.'It is established that Biltmore executed mortgages to Perpetual in the sum of $472,900 on April 10, 1947, and that Perpetual sold the mortgages for the face value and received the money. It did not advance any money to the builder during construction. How then did it dispose of the proceeds? Charles of Perpetual knows the answer but he does not speak and we can only conclude that if it was not paid to Biltmore, to whom it belonged, it was diverted into other channels for the benefit of Biltmore's stockholders. This must have been the case, since the evidence shows that the stockholders of Biltmore received no part of the profit on the building transaction when Biltmore was liquidated on December 31, 1948.
 
 
 19
 Two additional questions, one relating to moneys received by Charles Cooper from the Cooper Motor Lines, Inc. in 1947 and 1948, and one relating to the proceeds of a sale of residential property received by Frank Cooper in 1951, remain to be considered. Cooper Motor Express, Inc., a South Carolina corporation, was organized to conduct an interstate motor transportation business. It had 300 shares of capital stock with a par value of $10 per share which was owned in equal portions by six members of the Cooper family, including the three brothers in this case. On March 5, 1942 its operating assets, together with certain liabilities, were transferred to Cooper Motor Lines, Inc., a new corporation, under a contract which provided that a certain percentage of the gross receipts of the Motor Lines should be paid to Motor Express, its successors and assigns. After the transfer Motor Express had assets of $100,396.05 in addition to the contract with Motor Lines, and liabilities (including $3,000 of capital stock) of $153,905.87, or a deficit of $53,509.82.
 
 
 20
 On January 1, 1943, Charles Cooper acquired all the assets of Motor Express, including its contract with Motor Lines, and assumed all the liabilities of Motor Express. According to a stipulation Charles received the assets of Motor Express, including the contract with Motor Lines, in return for assuming the liabilities of Motor Express. This stipulation does not allocate the purchase price amongst the assets of Motor Express so as to show the cost to Charles of the several items of assets, including the Motor Lines contract.
 
 
 21
 On November 1, 1945, Charles and the Motor Lines, by contract, changed the amount of the payments to be made by Motor Lines under the contract which Charles had acquired. Thereafter Charles received the following payments from Motor Lines:
 
 
 22
 1945-- $20,000.00
1946-- 13,333.33
1947-- 6,000.00
1948-- 19,194.00
 
 
 23
 In his return for 1947, Charles reported the receipt of $6,000 from this source but claimed that it represented a partial return of the cost of acquiring the motor contract. In 1948, he deducted $398.77 as part of the cost of the contract and reported 50 per cent of the balance of $19,541.23 as a long-term capital gain. He now says that the correct balance should have been $5,763.51 since $14,176.49 of the amount received in 1948 represented the final recovery of the cost of the motor contract. He concedes, however, that the amount received was ordinary income. The Commissioner determined that Charles had recovered the cost in prior years and that the amount received in 1947 and 1948 were ordinary income. The Tax Court upheld the determination of the Commissioner on the ground that the taxpayer had not shown what portion of the cost incurred in acquiring the assets and the Motor Lines contract from Motor Express should be allocated to the contract, and had not shown that an allocation was impracticable. We are in accord with this conclusion. It has long been established that when a mixture of assets is acquired at one time the total purchase price must be allocated, if practicable, among the assets so as to determine the profit earned in subsequent sales of specific items. 3A Mertens, Law of Federal Income Taxation, 21.32. Since the taxpayer has offered no evidence on this point and has not met this test, he has failed to show that the Commissioner's determination was erroneous. Burnet v. Houston, 283 U.S. 223, 51 S.Ct. 413, 75 L.Ed. 991. A taxpayer cannot establish erron in the determination of the Commissioner when he fails to present evidence to establish a definite cost basis.
 
 
 24
 The question as to the taxability of the gain derived by Frank Cooper from the sale of residential property calls for an application of 112(n)(1), Internal Revenue Code 1939, 26 U.S.C.A. 112(n)(1). This provides that if property used by a taxpayer as his principal residence is sold and within a period beginning one year prior to the sale and ending one year thereafter other property is purchased and used by the taxpayer as his principal residence, the gain from the sale of the ole property shall be recognized only to the extent that the taxpayer's selling price of the old exceeded the purchase price of the new property. Frank Cooper, in 1946, bought the property at 319 North Trenholm Street, Columbia, South Carolina, where he resided with his parents. He was married in September 1949 and left this residence and moved with his wife to a rented house, where he lived until November 10, 1951. He then moved into a house on Country Club Drive, Columbia, South Carolina, which he had bought at a cost in excess of $30,000. On November 12, 1951, he sold the Trenholm Street property to his mother for $30,000. She had continued to live in the house after Frank and his wife were married in 1949.
 
 
 25
 Frank had paid $10,400 for the Trenholm Street property so that he made a profit of $19,600 when he sold it to his mother. He claims, however, that under the provisions of the statute the gain should not be recognized. His theory is that the Trenholm Street house continued to be his principal residence until 1951, when he moved into his new house on Country Club Drive. The Commissioner rejected this contention and increased his net income by 50 per cent of the gain of $19,600 and the Tax Court affirmed this determination. This decision was correct. Regulation 111, 29-112(n)(1), 1939 Code, provides that whether or not a property is used by the taxpayer as his principal residence depends upon all the facts and circumstances of the particular case. The facts in this case strongly support the conclusion that after the taxpayer was married and moved into another house the property at 319 North Trenholm Street ceased to be his residence and thereafter his residence was the property occupied by himself and his wife.
 
 
 26
 Affirmed.
 
 
 
 [1]
 Only ninety houses were built so that the total amount paid to Faust for the construction of the houses was $360,000