Robert S. Brown and Sara M. Brown v. Commissioner.Brown v. CommissionerDocket No. 4191-68.United States Tax CourtT.C. Memo 1971-166; 1971 Tax Ct. Memo LEXIS 164; 30 T.C.M. (CCH) 708; T.C.M. (RIA) 71166; July 19, 1971, Filed *164 Petitioners owned directly three corporations - Home, Reserve, and Simplicity. They owned indirectly one corporation, Clinton, which distributed certain real estate to them in 1961. Respondent determined that petitioners received part of the real estate without paying any consideration therefor and further concluded that that amount constituted a dividend distribution from Home. Held, respondent sustained in that no consideration was paid for part of a distribution received by petitioners. Held, further, that part of the distribution shall be treated as a distribution from Clinton to Reserve and Simplicity, which in turn made a distribution to petitioners. Held, further, petitioners are taxable on the distributions as dividends only to the extent of accumulated and current earnings and profits of Reserve and Simplicity. Excess is return of capital. Mark B. Edwards, 900 North Carolina Natl. Bank Bldg., Charlotte, N.C., for the petitioners. James D. Burroughs, for the respondent. IRWIN*165 Memorandum Findings of Fact and Opinion IRWIN, Judge: The Commissioner determined a deficiency in petitioners' income tax for the taxable year 1961 in the amount of $71,531.09. The sole issue for decision is whether petitioners received ordinary income in the amount of $112,214.45 1 upon the transfer to them of certain real property by The Clinton Corporation. Findings of Fact Some of the facts have been stipulated by the parties. The stipulations, together with the exhibits attached thereto, are incorporated herein by this reference. *166 Petitioners Robert S. Brown (hereinafter referred to as Robert or petitioner) and Sara M. Brown, 2 husband and wife, filed a joint Federal income tax return for the taxable year 1961 with the district director of internal revenue, Manhattan, New York, N. Y. At the time of the filing of the petition in this case, they resided in Asheville, N.C. Petitioners controlled, directly or indirectly, the following four corporations: Home Manufacturing Company (hereinafter Home), Reserve Textiles, Inc. (hereinafter Reserve), Simplicity Frocks, Inc. (hereinafter Simplicity), and The Clinton Corporation (hereinafter Clinton). The stock ownership of these corporations during the year at issue was as follows: HomeSim-ReserveClintonplicityRobert (common)304230(preferred)70Sara (common)3003580(preferred)181Robert Hunter Brown 3 (preferred)1O. M. Christensen 4 (preferred)100Mary Allison Brown 3 (preferred)1Reserve (common)60,000Simplicity (common)40,000Total shares out- standing (common)60435310100,000(preferred)353$'*167 709 By way of background, Home, which was incorporated in Illinois on December 12, 1939, and which maintained its books and records on a fiscal year ending October 31, was principally engaged in the business of garment manufacturing in Decatur, Ill. Simplicity, which was incorporated in Illinois on March 23, 1944, and which maintained its books and records on a fiscal year ending February 28, was engaged in the sale of ladies' dresses. In particular, it served as a sales outlet for Home and Clinton and also advertised and promoted their products. As of the date of the trial, Simplicity was still in existence despite the fact that it had terminated conducting any business in 1968. Reserve, which had at one time purchased piece goods and indicated its business activity on Federal income tax returns as print cloth converter, was incorporated in Illinois on*168 May 3, 1949. Its operations, which were located in Fairfield, Ill., were conducted on a fiscal year ending October 31. At the end of the year at issue, 1961, Reserve was a dormant corporation which held stock of Clinton, as well as some United States Government bonds which it sold in November 1962. In 1957 or 1958, Home began to encounter union difficulties which arose as a result of union demands to impose a higher wage structure on the garment industry in Illinois. The management of Home believed that it could not continue to operate profitably if it acceded to these union demands. Rather than lose an opportunity to continue to manufacture profitably and since a sales volume was available, Home decided to start a new manufacturing operation elsewhere. It was sometime in 1958 that Home decided to move its entire operation to North Carolina. Thus, Clinton was incorporated there during that year. Clinton, like Home, was engaged in the garment manufacturing business. Its operations were located in Barnardsville, N.C., and it maintained its books and records on a calendar year basis. Petitioner managed Clinton from its inception until its dissolution in 1968. However, as of 1961, *169 he had received no salary or compensation from it. During the period in which Clinton's operations were just beginning, Home continued to manufacture garments but it concentrated its operations on the manufacture of garments on which the markup was sufficient to support the union wage scale. Eventually, however, economic pressures increased to the point that during its fiscal year ended October 31, 1962, Home discontinued manufacturing dresses and sold the major portion of its assets to various outside firms. The remaining assets were transferred to Simplicity at book value. 5Under a contract Home had with the union, it could not move its operations. In order to avoid union trouble, *170 all transactions between Home and Clinton were made through Simplicity and Reserve, Clinton's two corporate stockholders. As of December 31, 1961, practically all the available funds of Home, Simplicity, and Reserve had been borrowed by Clinton, either to acquire fixed assets and inventories or to pay operating expenses. Raw materials used by Clinton were billed through Reserve and some of them were paid for by Home. In such instances, Home paid for the materials directly and showed the amount paid as an account receivable from Reserve. In 1960 or 1961 the union brought suit against Home, Simplicity, and petitioner as an individual, alleging that assets of Home had been channeled to Clinton. The court concluded that no channeling had occurred. Clinton was indebted to Reserve and Simplicity in the amount of $234,715 as of October 31, 1961. Clinton also was indebted to The Business Development Corporation of North Carolina and to Cecil's, Inc., in the total amount of $144,209.02 plus accrued interest of $600. This indebtedness and the capital structure of Clinton were such that its credit in the trade was endangered. In an effort to alleviate this situation, Clinton's board of directors*171 approved several resolutions on December 26, 1961, which provided, in pertinent part, as follows: Whereas, the affiliated companies [Reserve and Simplicity] are solely owned 710 by Robert Brown and Sally Brown and they together with Robert and Sally Brown have agreed that the amounts due be adjusted by the issuance of common stock and the transfer of the real estate owned by * * * Clinton * * * to Robert * * *. BE IT RESOLVED: That this corporation convey its land and buildings to Robert and Sally Brown upon payment by them of the sum of $161,425.32 and assumption by them of the balance due The Business Development Corporation of North Carolina and Cecil's, Inc. of $144,209.02 and the accrued interest thereon in the amount of $600. That the offer of Simplicity Frocks to purchase 60,000 shares of the corporation's common stock for the sum of $125,000, be and it hereby is accepted and the proper officers of this corporation are authorized to issue 40,000 of such shares representing the balance of the corporation's unissued shares and to further issue the additional 20,000 shares upon amendment of the corporation's charter to permit such issuance. BE IT FURTHER RESOLVED, *172 that this corporation enter into a lease as of January 1, 1962 with Robert S. and Sally Brown whereby it will lease the premises formerly owned by the corporation at Barnardsville, N.C. from them for a period of ten years at a net rental of $2500 per month. Petitioners agreed to pay the higher of the appraised value or book value of the land and building in question and to assume Clinton's liabilities in connection therewith. On December 29, 1961, Clinton conveyed to petitioners its land and building by deed dated December 26, 1961. The fair market value of these properties at the date of transfer was $296,000. The book value as of that date was as follows: Building cost$301,189.72Lot cost12,000.00Total cost of building and lot$313,189.72Less reserve for depreciation as of 12-31-616,955.38Basis to Clinton$306,234.34 On December 29, 1961, Clinton made the following entries on its books: DebitCreditAccrued Interest$ 600.00Reserve for Depreciation6,955.38Contracts Payable - Building144,209.02Due from R.S. and Sara Brown6 161,425.32Building$301,189.72Land12,000.00To record sale of building and land to R.S.and Sally Brown.Accts. Payable - Reserve Textiles$111,014.02Accts. Payable - Simplicity Frocks7 66,534.77Due from R.S. and Sara Brown Accts.8 $177,548.79To record assumption of debt to accts. byR.S. and Sally Brown.Accts. Payable - Simplicity Frocks7 $125,000.00Capital stock$ 60,000.00Surplus65,000.00To record issuance of common shares.Investments$125,000.00Accts. Rec. - Clinton$125,000.00Accts. Rec. - Reserve Textiles77,137.73Accts. Rec. - Clinton77,137.73*173 No reciprocal entries were made on the books of Simplicity and Reserve to reflect the alleged assumption by petitioners of the indebtedness of $66,534.77 and $111,014.02 which Clinton owed to Simplicity and Reserve, respectively. However, the following journal entries were made on Simplicity's books as of December 31, 1961: 711 Petitioners did assume the contract payable of $144,209.02, secured by*174 a deed of trust, plus accrued interest of $600, at the time of the conveyance of the properties in question to them. Audited financial statements were prepared for Clinton's taxable year ended December 31, 1961, by a firm of certified public accountants. Among these statements was the following balance sheet with explanatory notes attached thereto: ASSETSCURRENT ASSETS:Cash$ 16,031.36Accounts Receivable -$81,852.44TradeLess: Reserve for1,000.0080,852.44DiscountsInventories:Raw Materials$66,965.00Work in Process55,665.00Finished Goods57,085.00179,715.00Prepaid Expenses7,350.00$283,948.80MACHINERY AND$87,070.61EQUIPMENT - NoteMachinery andEquipmentOffice Equipment3,046.33Automotive2,812.30$92,929.24Less: Accumulated11,598.9281,330.32DepreciationOTHER ASSETS:Due from Affiliated$ 8,574.91CompanyDue from Employees454.00Organization Expense1,923.65Deferred Charges13,040.0023,992.56*13 $389,271.68LIABILITIES ANDSTOCKHOLDERS'EQUITYCURRENT LIABILITIES:Notes Payable:Equipment Purchases -$ 16,102.03Due Within One YearAccounts Payable -151,454,32TradePayroll Taxes12,833.87Accrued Expenses12,026.17$192,416.39LONG-TERM DEBT:Notes Payable$ 26,684.24Less: Portion Due16,102.03* $Within One Year10,582.41Due to Affiliated1,225.0011,807.41CompanyOTHER LIABILITIES:Stock Subscription -20,000.00NoteSTOCKHOLDERS' EQUITY- Note:Common Stock - Par$100,000.00Value $1.00 PerShare; Au- thorizedand Outstanding100,000 SharesSurplus:Capital Surplus$145,700.00(Deficit) from(80,652.12)65,047.88165,047.88Operations$389,271.68*175 712 The explanatory notes stated, in part, as follows: On December 30, 1961 The Clinton Corporation sold to Robert and Sally Brown the land and factory buildings located at Barnardsville, N.C.A lease agreement was negotiated with Robert and Sally Brown for the Corporation to lease the said land and buildings at a rental of approximately $2,500.00 per month. The consideration received in the sale of the property was the liquidation of certain payables due to affiliated companies wholly owned by Robert and Sally Brown. In connection with the sale of the land and buildings to Robert and Sally Brown and the liquidation of certain payables due to affiliated companies, 40,000 shares of capital stock, par value $1.00 per share was issued to Simplicity Frocks, Inc. An additional 20,000 shares will be issued to Simplicity Frocks, Inc. upon amendment of the corporation's charter which is currently in process. Petitioners never gave Reserve or Simplicity any notes or other evidence of indebtedness for the amounts written off the books of Clinton. Moreover, Reserve and Simplicity never took any steps against*176 petitioners to collect any of the indebtedness due them that was allegedly assumed by petitioners in connection with the transfer of Clinton's land and building. Such action would have been futile, however, because petitioners did not have the resources to pay off the indebtedness. Petitioners were relying upon the successful operation of Clinton to provide them with financial resources. In 1968 petitioners sold the real estate they acquired from Clinton. On July 3, 1968, five checks were drawn by Robertson Wall, who was acting as both Clinton's and petitioner's attorney. These checks were drawn against a trustee bank account into which had been deposited the proceeds from this sale. The payees, amounts and other pertinent information relating to these five checks are as follows: CheckNo.PayeeAmount9 Purpose of146Seyfarth, Shaw, Fairweather and Geraldson$15,000.00Payment for legalservices ren-dered by namedpayee to Home andSimplicity148Bennett & Shade Company300.0010 Payment ofinsurance charges149Downing, Smith, Jorgensen & Uhl390.46Payment for legalservices ren-dered by namedpayee to Home andSimplicity150Nicholson, Clark & Company1,271.59Payment foraccount due fromSimplicity tonamed payee151Wachovia Bank & Trust Co30,002.5011 Payment foradvertising mate-rials and servicesdue Westlake Pressfrom Simplicity*177 As of December 31, 1961, the books of Simplicity reflected the following: DebitCreditAccts. Payable - Home Manufacturing Co$164,339.90Accts. Receivable:The Clinton Corporation$193,562.82Reserve Textiles, Inc.27,354.65 These totals are prior to the posting of any journal adjusting entries in connection with the transfer of the land and building to petitioners. As of December 31, 1961, the books of Home reflected the following: DebitCreditAccts. Receivable:Reserve Textiles, Inc.$ 66,330.38Simplicity Frocks, Inc.183,173.98 713 As of December 31, 1961, the books of Clinton reflected the following: DebitCreditAccts. Payable:Reserve Textiles, Inc$111,014.02Simplicity Frocks, Inc12 182,359.86*178 These totals are prior to the posting of any journal entries arising in this case. As of December 31, 1961, the books of Reserve reflected the following: DebitCreditAccts. Receivable - The Clinton Corporation$111,014.02Accts. Payable - Home Manufacturing Co.$ 63,848.44As of dates indicated, the following named corporations had an earned surplus in the amounts indicated below: CorporationDateEarned SurplusReserve10-31-61$ 51,773.7010-31-6251,490.29Simplicity2-28-6114,048.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,051.95Home12-31-61118,406.00Respondent determined that petitioners received ordinary income in the amount of $112,814.45 13 as a result of the aforementioned transfer of properties to them by Clinton and as a result of certain related transactions which indirectly involved Home, Simplicity, and Reserve. *179 The following is respondent's computation: Fair Market Value of Properties Conveyed to$296,000.00Petitioners by Clinton14 Advances by Clinton to Petitioner Written off16,123.47Clinton's BooksTotal Property Received by Petitioners from$312,123.47ClintonLess: Contract Payable and Accrued Interest of$144,809.02Clinton Assumed by PetitionersAmount Due Petitioners by Reserve Canceled in15 54,500.00199,309.02Connection with TransactionIncrease in Income$112,814.45As a result of this increase in petitioners' income, respondent further determined that they were not entitled to any medical expense deduction. Opinion Clinton transferred certain real property valued at $296,000 to petitioners by deed*180 dated December 26, 1961. Respondent contends that as a result of this transfer and certain related transactions indirectly involving Home, Simplicity, and Reserve, petitioners received ordinary income in the amount of $112,214.45. Prior to the trial herein, petitioners filed a motion for a further and better statement. In particular, petitioners requested that respondent specify the facts and legal rationale upon which he relied in determining the deficiency. Respondent thereafter filed an amended answer in which he set forth the specific facts upon which he was relying as well as five alternative theories 16 to support the deficiency. *181 On brief, however, respondent stated his position as follows: 714 The transfer of the land and building by Clinton and the satisfaction of advances made by Clinton to the petitioners were in substance distributions by Home and are taxable to petitioners as dividends. In our opinion, respondent has abandoned the other theories he advanced in his amended answer. Our view is fortified by the following statement contained in Respondent's reply brief: Petitioners make additional comments on possible theories available for taxing them which were raised by the respondent in his amended answer. These theories were raised prior to the trial of this case and prior to the full facts being clearly established. Respondent has set forth his position in his original brief and does not deem it necessary to comment on these additional theories. When all the facts are evaluated, it is clear that the objective in transferring the real property to petitioners was to distribute the earnings and profits of Home. Petitioners, on the other hand, argue that the transfer of the real property to them constituted a bona fide sale. Therefore, they contend that they realized no income in connection*182 therewith because they allegedly paid good and valuable consideration to Clinton in an amount in excess of the property's fair market value. Petitioners allege that part of the consideration for the transfer in question was the assumption by them of certain debts of Clinton. In particular, petitioners assert that they assumed the following accounts payable of Clinton: Account Payable - Reserve$111,014.02Account Payable - Simplicity66,534.7717 $177,548.79 While respondent does concede that petitioners assumed the mortgage on the property transferred to them, as well as certain other trade liabilities, he contends that they did not assume Clinton's liabilities to Reserve and Simplicity; that they never intended to repay Reserve and Simplicity; that there was no bona fide sale; and that Clinton served merely as a conduit through which assets passed from Home to Home's common shareholders, petitioners. While we agree with respondent that the record herein does not support a finding that petitioners assumed Clinton's liabilities to Reserve and Simplicity, we cannot conclude that the substance of the transactions described*183 herein was that Home made distributions which are taxable to petitioners as dividends. Rather we hold for reasons which we will set forth later that petitioners received a distribution of $45,528.67 from Reserve and a distribution of $66,685.78 from Simplicity which are taxable as dividends only to the extent of the respective earnings and profits of those two corporations. 18Turning first to petitioners' contention that they did in fact assume Clinton's obligatios to Reserve and Simplicity and, therefore, paid good and valuable consideration to Clinton for the real property transferred to them, we note that the minutes of Clinton's board of directors' meeting do not, as petitioners assert, indicate that petitioners assumed the accounts payable to Reserve and Simplicity. Rather these minutes reveal that Clinton was to transfer the real property in question to petitioners upon payment by them of $161,425.32 and the assumption by them of the $144,209.02 balance due The Business Development Corporation of North Carolina and Cecil's, Inc., plus the accrued interest thereon of $600. *184 No mention is made in these minutes of petitioners' assuming any of Clinton's obligations to Reserve and Simplicity. It appears instead that Clinton's indebtedness to its two corporate stockholders was to be partially liquidated by the issuance of 60,000 shares of common stock to them. We realize that notes attached to audited financial statements of Clinton indicated that the consideration received on the sale of the real estate was the liquidation of certain payables due to affiliated companies wholly owned by petitioners. However, this statement is not conclusive on the issue of whether petitioners did in fact intend to assume and pay Clinton's obligations to 715 Reserve and Simplicity. It is but one factor to weigh in our examination of the entire record bearing on this issue. The other factors to which our attention is directed by petitioners are the testimony of Robert that he intended to repay Reserve and Simplicity and the payments which they made to Simplicity in 1968, allegedly as repayment of part of the indebtedness. As to Robert's testimony, we observe that the statement of an interested party of his intention and purpose is not necessarily conclusive. Helvering v. Nat. Grocery Co., 304 U.S. 282 (1938).*185 To be skeptical of the weight to be accorded an interested witness' statement in view of other evidence is not the same as wholly to reject the statement as if it were dishonest. One's categorical statement may be of less weight than the facts and circumstances which affect it. R. L. Blaffer & Co., 37 B.T.A. 851 (1938), affd. 103 F. 2d 487 (C.A. 5, 1939), certiorari denied 308 U.S. 576 (1939). See also American Properties, Inc., 28 T.C. 1100(1957), affd. 262 F. 2d 150 (C.A. 9, 1958). However, it is clear that we cannot ignore a taxpayer's testimony when it is consistent with other proved facts. See Foran v. Commissioner, 165 F. 2d 705 (C.A. 5, 1948), reversing a Memorandum Opinion of this Court; Estate of Isadore Benjamin, 28 T.C.101 (1957). The problem confronting us is that there are very few facts supporting petitioner's testimony that he assumed the liabilities in question and intended to repay them. We have only the book entries made by Clinton which are set out in our findings of fact and the note attached to Clinton's audited financial statements which we mentioned earlier. Petitioners also argue*186 that payments totaling approximately $47,000 19 made in July 1968 for the benefit of Home and Simplicity evidence an intention on their part to pay off the liabilities in question. These payments were made from the proceeds of sale of the real estate conveyed to petitioners by Clinton in 1961. Aside from the fact that it is unclear from the record exactly how much of this total amount was paid for the benefit of Simplicity, the fact that these payments were made over six years after the alleged assumption of liabilities seriously undermines the probative value of such evidence on the issue of whether petitioners intended to repay Clinton's indebtedness. We will make one final observation as to the evidentiary value of these 1968 payments. Petitioner's wife was the sole stockholder of Simplicity, and it is certainly conceivable, absent evidence to the contrary, that these payments were capital contributions to Simplicity rather than a discharge of the indebtedness in question. See National Carbide Corp. v. Commissioner, 336 U.S. 422 (1949); American Cigar Co. v. Commissioner, 66. F. 2d 425 (C.A. 2, 1933). *187 In light of the dearth of facts on this issue, as well as the nonconclusive character of the facts we do have, we hold that petitioners have not sustained their burden of proving that they assumed Clinton's indebtedness to Simplicity and Reserve in December 1961. Therefore, respondent correctly determined that petitioners did not pay adequate consideration for the property transferred to them. 20*188 The next issue we must face is whether and how this economic benefit flowing to petitioners as a result of the transfer of real property to them is taxable. Respondent contends that the alleged sale was in effect nothing but "a useful implement to distribute the corporate earnings of Home." He apparently wants us to construe the formation of Clinton in 1958 and the transfer of funds to it by Home through Reserve and Simplicity over the period 1958 through 1961 as nothing more than a master plan to distribute Home's 716 earnings and profits to petitioners who directly or indirectly owned all four corporations described herein. We simply cannot sustain respondent's contention on this record. Home began to encounter union problems in 1957 or 1958 as a result of union demands to impose a higher wage structure on the garment industry in Illinois. Home's management did not feel it could operate profitably if it acceded to the union demands. However, rather than lose the opportunity to continue to manufacture profitably, Home decided to start a new manufacturing operation. Clinton was incorporated in North Carolina in 1958. During the formative years of Clinton, Home continued to*189 manufacture high-profit lines. According to a union contract, Home could not move its operations. Therefore, all transactions between Home and Clinton were made through Simplicity and Reserve to avoid union trouble. It has been stipulated that as of December 31, 1961, practically all the available funds of Home, Reserve and Simplicity had been borrowed (those from Home through Reserve and Simplicity) by Clinton for the purpose either of acquiring fixed assets and inventories or paying operating expenses. As of the same date, the books of Reserve and Simplicity indicated accounts payable to Home and the books of Home showed accounts receivable from those two corporations. Furthermore, Clinton's records reflected accounts payable to Reserve and Simplicity. The aforementioned evidence and the record as a whole convinces us that Home's funds were merely advanced to Reserve and Simplicity, which in turn advanced funds to Clinton. We are satisfied in light of the state of the record herein that these funds were intended to be repaid. Therefore, we cannot conclude that the distribution of property from Clinton was nothing more than a distribution of Home's earnings and profits to its stockholders,*190 petitioners herein. We are still left with the fact that property was transferred to petitioners, the fair market value of which exceeded the consideration paid iherefor. Section 316 of the Internal Revenue Code of 195421 defines a dividend as any distribution of property made by a corporation to its stockholders out of its earnings and profits. Section 1.301-1(j), Income Tax Regs., provides, in pertinent part, as follows: If property is transferred by a corporation to a shareholder which is not a corporation for an amount less than its fair market value in a sale or exchange, such shareholder shall be treated as having received a distribution to which section 301 applies. In such case, the amount of the distribution shall be the difference between the amount paid for the property and its fair market value. * * * Whether the transfer of property to a stockholder constitutes a dividend is not necessarily determined by the intention of the parties to the particular transaction. It depends rather upon all the facts and circumstances and*191 the substance to the transaction. There need not be a formal declaration of a dividend, nor need the distribution be made pro rata to all stockholders. Palmer v. Commissioner, 302 U.S. 63 (1937); Timberlake v. Commissioner, 132 F. 2d 259 (C.A. 4, 1942), affirming 46 B.T.A. 1082 (1942). See also Commissioner v. Makransky, 321 F. 2d 598 (C.A. 3, 1963); Biltmore Homes, Inc. v. Commissioner, 288 F. 2d 336 (C.A. 4, 1961); Paramount-Richards Th. v. Commissioner, 153 F. 2d 602 (C.A. 5, 1946); Eastern Carbon Black Co. v. Brast, 104 F. 2d 460 (C.A. 4, 1939); Harry L. Epstein, 53 T.C. 459 (1969); Lester E Dellinger, 32 T.C. 1178 (1959); V. U. Young, 5 T.C. 1251 (1945), supplemental opinion 6 T.C. 357 (1946). If the alleged sale in question had been made to Reserve and Simplicity directly, Palmer v. Commissioner, supra, and Timberlake v. Commissioner, supra, would be directly in point. The instant case is distinguishable from those two cases only in that the transfer herein was not to Reserve and Simplicity, the corporate*192 stockholders of the distrbuting corporation Clinton, but was to petitioners, the individual shareholders of Simplicity and Reserve. It is clear that the rule enunciated in the Palmer and Timberlake cases "cannot be circumvented by introducing this additional step." V. U. Young, supra at 5 T.C. 1257. Moreover, it is not critical that the distribution did not pass physically through Reserve and Simplicity 717 to petitioners. See generally Commissioner v. Makransky, supra; Biltmore Homes, Inc. v. Commissioner, supra; V. U. Young, supra at 5 T.C. 1257. In substance, what transpired here was a distribution of $166,714.45 22 by Clinton to its two stockholders, Reserve and Simplicity, 23 followed by a distribution from Reserve and Simplicity to petitioners. V. U. Young, supra. This distribution is taxable as a dividend only if it was made out of the accumulated earnings and profits or out of the current earnings and profits of Reserve and Simplicity. Section 316. *193 We are aware that certain adjustments to the earnings and profits accounts of Reserve and Simplicity may be required as a result of our holding that there was a constructive distribution of $166,714.45 from Clinton to those two corporations. However, since the record herein is very scanty with respect to the records of Reserve and Simplicity, and in particular as to their bases in the Clinton stock, we are of the opinion that any such adjustments should be made in the Rule 50 computation. Since Reserve owned 60 percent of Clinton and Simplicity owned 40 percent, the total distribution of $166,714.45 for which no consideration was paid should be treated as having passed from Clinton to its two corporate stockholders in those respective proportions. Furthermore, the distribution from Reserve to petitioners must be reduced by the $54,500 debt due them from Reserve which it canceled in connection with the transaction involved herein. The net effect is that petitioners, the stockholders of Reserve, received a distribution of $45,528.67, while Sara, petitioner's wife and the sole stockholder of Simplicity, received a distribution of $66,685.78. We reiterate that the distributions are*194 taxable as dividends only to the extent of the accumulated and current earnings and profits of Reserve and Simplicity. The excess shall be treated as capital gain to the extent it exceeds petitioners' adjusted bases in their stock in Reserve and Simplicity. That portion of the distributions which is not a dividend and which does not exceed their bases therein shall be applied against and reduce their respective bases in the stock of Reserve and Simplicity. In order to reflect the conclusions reached herein, Decision will be entered under Rule 50. Footnotes1. Respondent had originally determined in his statutory notice of deficiency that petitioners received ordinary income in the amount of $112,814.45. However, on brief, he conceded that this amount should be reduced by $600. Apparently the error involves certain advances from Clinton to petitioner.↩2. Petitioner Sara M. Brown is sometimes referred to as Sally Brown.↩3. Robert Hunter Brown and Mary Allison Brown are children of petitioners. ↩4. O. M. Christensen was president of Home for several years and comptroller of petitioners' corporations and financial advisor to petitioner for an indeterminate number of years, commencing prior to 1961 and continuing subsequent thereto.↩5. A statement to this effect was contained on the corporate Federal income tax return filed by Home for its taxable year ended October 31, 1962. The statement is as follows: As HOME MANUFACTURING COMPANY had discontinued the manufacturing of ladies dresses, the major portion of the fixed assets listed on this form were sold to various outside firms at various dates during the current year. The remaining portion was taken over by SIMPLICITY FROCKS, INCORPORATED, at book value. Barnardsville, N.C.↩6. Petitioners gave no notes or security to Clinton for this amount. Instead, Clinton offset this account receivable, plus an additional amount of $15,523.47 which had been advanced to petitioner by Clinton, against its indebtedness to Reserve and Simplicity. This credit was erroneously listed in Clinton's books as $177,548.79, instead of $176,948.79. ↩7. We are aware of the discrepancy of approximately $9,000 in Clinton's books in connection with the total amount that Clinton owed Simplicity. See footnote 12, infra. However, we feel that this discrepancy can probably be explained away by the fact that some of these book entries were made as of December 29, 1961, while others were made as of December 31, 1961. ↩8. This credit should be $176,948.79. See footnote 6, supra.↩*. This is a mathematical error. The correct figure should be $10,582.21.↩9. The purpose was indicated on the face of each check. Moreover, petitioner clarified the notations thereon by his testimony. ↩10. It does not appear in the record for whom charges were incurred. ↩11. Petitioner obtained a mortgage on a building he owned as security to the Westlake Press for payment of money due from Simplicity to Westlake Press. He eventually paid off this debt of Simplicity.↩12. According to Clinton's books as of December 29, 1961, it owed Simplicity $191,534.77. See footnote 7, supra. The discrepancy could well be attributable to the fact that the entries were made two days apart.↩13. Respondent conceded that this amount should be reduced by $600. See footnote 1, supra.↩14. On December 31, 1961, petitioner was indebted to Clinton for withdrawals to the extent of $15,523.47, not $16,123.47. See footnote 1, supra. ↩15. On or about December 31, 1961, Reserve had a note payable to petitioners in the amount of $54,500. This note was apparently canceled as a result of the conveyance in question. After December 31, 1961, petitioners no longer considered that amount owing to them from Reserve.↩16. These espoused theories were: (1) The taxable income in question constituted compensation from Clinton, inasmuch as the husband-petitioner had rendered substantial services to Clinton without the receipt of any other compensation. (2) Alternatively, said taxable income constituted a taxable distribution connected with a reorganization inasmuch as the business activities of Home were transferred to Clinton as part of a reorganization. (3) Alternatively, the taxable income constituted a dividend inasmuch as the amounts advanced by Home through Simplicity and Reserve to Clinton could have been bona fide loans which were, in substance, repaid in part when the land and building were conveyed by Clinton to the petitioners. If Clinton had repaid the loans to Home by transferring the realty to Home and then Home had subsequently conveyed the realty to the petitioners, the effect is the same - the receipt of a dividend by the petitioners. (4) Alternatively, if Reserve's assets and liabilities had been transferred to Home by Home's paying Reserve the book value of its capital and suplus, thereby discharging the intercompany indebtedness, this would have been, in substance, the same as if petitioners had transferred their Reserve stock to Home. Thus, the acquisition of such stock would be deemed to be a taxable dividend to the extent of Home's earnings and profits. (5) Alternatively, the conveyance could be likened to a sales transaction generating taxable income to the petitioners from a bargain purchase, because under the facts set out above, the transaction was in effect an implement to distribute the corporate earnings of Home and/or Reserve.↩17. See footnote 8, supra.↩18. It is noteworthy that Clinton did not have any earnings and profits as of the close of 1961.↩19. The liabilities alleged assumed by petitioners totaled approximately $178,000.↩20. Petitioners cite the case of Canestrino v. Powell, 231 N.C. 190, 56 S.E. 2d 566↩ (1949), for the proposition that they were personally liable to Reserve and Simplicity under the laws of North Carolina as a result of their actions with Clinton. While we do not disagree with their interpretation of that case, we find it inapposite to the instant case. In the Canestrino case, the plaintiff sued, inter alios, the receivers of a railroad upon which he was riding when injured in a collision. During the pendency of the action, another railroad company contracted with the receivers to take over the operation of the railroad and specifically assumed, inter alia, any liability of the receivers arising from the pending action. The Supreme Court of North Carolina held, inter alia, that the plaintiff could sue the railroad company because he was occupying the status of a creditor beneficiary of the contract between the receivers and that company. It is clear that Canestrino, su9ra, involved a binding contract wherein a liability was in fact assumed. In the instant case, we are unable to find as a fact that petitioners assumed Clinton's liability to Reserve and Sim9licity.21. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩22. The amount of the distribution for which no consideration was paid was computed as follows: ↩Fair Market Value of Properties$296,000.00 lAdvances by15,523.47Transferred to Petitioners byClinton to PetitionersClintonWrittenoff Clinton's BooksTotal Property Transferred$311,523.47Less: Contract Payable and(144,809.02)Accrued Interest of ClintonAssumed by PetitionersTotal Distribution from Clinton$166,714.45to Reserve and Simplicity23. We need not concern ourselves with the effect of this construction distribution upon those two corporations since they are not petitioners herein. However, it is noteworthy that Clinton did not have any accumulated or current earnings and profits as of December 31, 1961. Moreover, we note that Reserve and Simplicity continued to be viable entities after the transactions in question and that the record does not establish any bona fide cancellation of the indebtedness from Clinton to Reserve and simplicity in connection with the transfer of properties in question to petitioners.↩