ROBERT W. McLEMORE AND LUCILE McLEMORE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McLemore v. Commissioner
Docket No. 4180-69.
United States Tax Court
T.C. Memo 1973-59; 1973 Tax Ct. Memo LEXIS 228; 32 T.C.M. (CCH) 259; T.C.M. (RIA) 73059; March 13, 1973, Filed *228 Louis E. Ackerson and Robert L. Ackerson, for the petitioners. Dennis M. Feeley, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION
FAY, Judge: Respondent determined a deficiency in the Federal income tax of petitioners for the taxable year 1965 in the amount of $46,246.67. The only issues presented for our consideration are whether a transfer by McLemore Realty Company, Inc., ("Realty") of $60,000 to Clark County Motors, Inc., ("Motors") on April 1, 1965, and/or an advance of $33,000 by Realty to petitioner Robert W. McLemore on April 1, 1965, 2 constituted a constructive dividend to petitioner Robert W. McLemore. FINDINGS OF FACT
Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners, Robert W. McLemore and Lucile McLemore, are husband and wife, who, at the time the petition herein was filed, maintained their legal residence at Louisville, Kentucky. Petitioners filed their joint Federal income tax return for the taxable year 1965 with the district director of internal revenue at Louisville, Kentucky. Lucile McLemore is a petitioner herein solely *229 by virtue of having filed a joint return with her husband. Hereinafter, references to "petitioner" are to Robert W. McLemore. Petitioner attended Vanderbilt University and Vanderbilt University Law School. Prior to engaging in the automobile business, he was vice-president of the Federal Land Bank. Petitioner owned the entire outstanding stock of Realty and Motors at all times during 1964 and 1965. Realty and Motors were incorporated in the State of Indiana. Motors was in the business of operating a Ford Motor Company ("Ford") automobile agency and Realty owned the building in which Motors operated. Motors was Realty's sole tenant until Motors ceased doing business on June 15, 1966. Motors' rental payments to 3 Realty varied from $1,500 per month in the earlier years to $1,800 per month in subsequent years. Motors was initially capitalized with $30,000. In 1964, petitioner contributed an additional $30,000 to Motors' capital. Ford requested this increase in Motors' capital due to Ford's belief that Motors' capital had been impaired. With the exception of the calendar year 1953, Motors operated profitably from its inception in 1946 up to and including December 31, 1957, at *230 which date its retained earnings account was $197,761.30. Commencing in 1958, Motors sustained a series of operating losses. Motors never regained a profitable status, and continued to experience operating losses until the date of petitioner's disposition of Motors' assets in 1966. Petitioner advanced an additional $24,000 to Motors on January 10, 1966. Motors sustained an operating loss of approximately $15,000 from January 1, 1966, through May 31, 1966. The following schedule portrays an analysis of Motors' retained earnings account for the calendar years 1951 through 1966: Retained earnings at January 1, 1951
$167,813.42
Net profit for 1951
$21,499.18
Dividend paid in 1951
(10,000.00)
11,499.18
Retained earnings at December 31, 1951
$179,312.60
Net profit for 1952
$4,338.69
Dividend declared and payable
(10,000.00)
(5,661.31)
Retained earnings at December 31, 1952
$173,651.29
Loss for 1953
$ (12,523.35)
Charge-off of goodwill
(4,517.89)
Dividend paid
(6,000.00)
$ (23,041.24)
Claim filed for refund of 1952 taxes
2,304.85
(20,736.39)
Retained earnings at December 31, 1953
$152,914.90
Net profit for 1954
$8,921.06
Dividend paid
(6,000.00)
2,921.06
Retained earnings at December 31, 1954
$155,835.96
Net profit for 1955
22,164.50
Retained earnings at December 31, 1955
$178,000.46
Net profit for 1956
11,947.22
Retained earnings at December 31, 1956
$189,947.68
Net profit for 1957
7,813.62
Retained earnings at December 31, 1957
$197,761.30
Loss for 1958
$ (37,612.74)
Claim for refund of taxes
13,207.68
(24,405.06)
Retained earnings at December 31, 1958
$173,356.24
Loss for 1959
$ (25,675.87)
Claim for refund of taxes
7,467.48
(18,208.39)
Retained earnings at December 31, 1959
$155,147.85
Loss for 1960
(34,346.59)
Retained earnings at December 31, 1960
$120,801.26
Loss for 1961
(27,254.02)
Retained earnings at December 31, 1961
$93,547.24
Loss for 1962
(64,818.05)
Retained earnings at December 31, 1962
$28,729.19
Loss for 1963
(12,222.35)
Retained earnings at December 31, 1963
$16,506.84
Loss for 1964
(47,550.51)
Deficit at December 31, 1964
$ (31,043.67)
Loss for 1965
(13,485.83)
Deficit at December 31, 1965
$ (44,529.50)
Loss for 1966
(93,483.68)
Deficit at December 31, 1966
$ (138,013.18)
*231 4 Under a floor plan agreement with the First National Lincoln Bank ("First National"), an individual note was executed upon receipt by Motors of each automobile and truck in Motors' inventory. When the vehicle was sold, Motors was required to make payment of the individual note. 5 In 1964, Motors' manager informed petitioner that Motors had received funds from the sale of vehicles and that the outstanding notes on those vehicles had not been satisfied. On December 31, 1964, petitioner borrowed $60,000 from First National. Petitioner received a $60,000 check from First National pursuant to the loan, and endorsed the check over to Motors in exchange for Motors' 90-day note. Motors used the $60,000 to pay First National the monies due First National under the floor plan agreement. On April 1, 1965, Realty borrowed $100,000 from the Clark County Bank of Clark County, Indiana, ("Clark County Bank") in exchange for which Realty gave Clark County Bank a mortgage on its real estate. Realty then advanced $60,000 on April 1, 1965, to Motors in exchange for Motors' demand note in the principal amount of $60,000. Motors, in turn, transferred $60,000 to petitioner on April 1, 1965, in *232 satisfaction of the $60,000 debt owned by Motors to petitioner. On April 2, 1965, petitioner purchased a cashier's check at Clark Cojnty Bank in the amount of $60,000 and paid off his personal debt of $60,000 to First National. On April 1, 1965, Realty advanced $33,000 to petitioner in exchange for which petitioner gave Realty his demand note. This demand note was unsecured and provided for no interest payments to Realty. The following is a copy of the demand note given by petitioner to Realty on April 1, 1965: 6 Jeffersonville, Ind. April 1, 1965 $33,000.00 On demand after date, I, we or either of us, promise to pay to the order of McLemore Realty Company, Inc. Thirty-three thousand Dollars Negotiable and payable at THE CLARK COUNTY STATE BANK of Jeffersonville, Indiana, without any relief whatever from Valuation or Appraisement Laws of the State of Indiana, for value received, with interest at 0 per cent per annum from and after until paid, and reasonable Attorney's Fees. The drawers and endorsers of this note severally waive its presentment for payment, protest, notice of protest and non-payment of this note. /s/ R. W. McLemore No. Due
In January 1966 petitioner advised *233 Ford that he desired to dispose of Motors. Petitioner subsequently sold the Motors' assets to a Ford-approved purchaser on May 31, 1966. As of December 31, 1965, Motors was in arrears on its rent to Realty in the amount of $15,427.58.When Motors ceased doing business in 1966, the back rent due Realty by Motors was reduced by $7,000 by reason of Motors' transfer to Realty of a piece of property owned by Motors and having a value of $7,000. Thus, Motors' unpaid rental account to Realty totaled $8,427.58. Realty was never paid this unpaid amount. Moreover, pursuant to Motors' discontinuance of its business operations in 1966, petitioner received two automobiles from Motors that had a combined value of $4,500. This reduced Motors' debt to petitioner to $19,500. Petitioner was never paid the $19,500 owned him by Motors. Motors never paid Realty the $60,000 which Motors 7 received from Realty on April 1, 1965. The following schedule indicates the salaries and dividends paid by Motors and Realty to petitioner during the years 1951 through 1966: Calendar
Motors
Realty Year
Salary
Dividends
Salary
Dividends
1951
$18,000.00
$10,000.00
$4,800.00
1952
18,000.00
10,000.00
4,800.00
1953
18,000.00
6,000.00
4,800.00 1954
18,000.00
6,000.00
4,800.00
1955
18,000.00
4,800.00
1956
18,000.00
4,800.00
1957
29,207.50
2,400.00
$ 1,800.00
1958
26,936.00
2,400.00
1959
24,000.00
2,400.00
1960
24,000.00
2,400.00
1961
24,000.00
2,400 .00
1962
21,000.00
2,400.00
1963
18,000.00
2,400.00
1964
14,250.00
2,400.00
1,500.00
1965
12,300.00
2,400.00
1966
6,050.00
2,000.00
$307,743.50
$32,000.00
$50,400.00
$5,300.00
*234 Petitioner never consulted his accountant with respect to the reasons motivating his decision to dispose of Motors. Petitioner's net worth was such that he was capable of repaying the $33,000 at all times subsequent to his receipt of this amount from Realty. Petitioner did repay $1,000 of this amount to Realty in June 1970 in order to enable Realty to satisfy a tax assessment. Petitioner intended to repay the $33,000 advance received from Realty only as determined by his personal convenience and/or by the cash needs of Realty. 8 ULTIMATE FINDINGS OF FACT
Realty's transfer of $60,000 to Motors on April 1, 1965, was primarily for the benefit of petitioner. Realty's advance of $33,000 to petitioner on April 1, 1965, was not a bona fide indebtedness. OPINION
The only issues for disposition are whether the purported $60,000 loan by Realty to Motors and/or the purported $33,000 loan by Realty to petitioner constituted a constructive dividend. With respect to the purported $60,000 loan, a transfer of funds between two related corporations will not necessarily result in a constructive dividend to a shareholder simply because he has an ownership interest in both the transferor *235 and transferee corporations. See W. B. Rushing, 52 T.C. 888, 894 (1969), affd. with respect to other issues 441 F.2d 593 (C.A. 5, 1971). However, a transfer of funds between related corporations may generate constructive dividend consequences when the transferred funds are expended either for a shareholder's personal benefit or in discharge of his personal obligation. Walter K. Dean, 57 T.C. 32, 40 (1971); Glenn E. Edgar, 56 T.C. 717, 758 (1971); and W. B. Rushing, supra, at 893. The crucial query for purposes of determining if the transfer of funds between related corporations results in a constructive dividend to a stockholder is whether the funds were transferred primarily for the stockholder's benefit. See 6 Sammons v. Commissioner, F.2d (C.A. 5, 1972), affirming in part and reversing in part a Memorandum Opinion of this Court; and W. B. Rushing, supra, at 893. Petitioner contends that Realty made its loan to Motors in order to assist Motors in reattaining a profitable status. Petitioner further contends that this action was designed "primarily" to protect Realty's economic interest, since *236 the economic revitalization of Motors would insure Motors' continuation as a viable tenant of Realty. We are not persuaded by these contentions. Contrary to what petitioner would have us do, we are unable to gloss over the following relevant factors: (1) Realty's transfer of $60,000 to Motors was followed closely in time by two apparently interrelated transactions; and (2) Motors had sustained financial losses during the entire period from 1958 through the taxable year in which the purported $60,000 loan to Motors was made. With respect to the first factor, Motors' purported borrowing of $60,000 from Realty on April 1, 1965, was not the only transaction that occurred on that date. To the contrary, Motors transferred to petitioner on April 1, 1965, the $60,000 obtained from Realty to satisfy Motors' debt to petitioner. Petitioner, in turn, used the $60,000 received from Motors to repay on April 2, 1965, his indebtedness to First National. With respect to the second factor, Motors experienced 10 continuous financial difficulties from 1958 through 1965. This is evidenced by the fact that Motors' retained earnings accounts declined from a surplus amount of $197,761.30 *237 as of December 31, 1957, to a deficit amount of $44,529.50 as of December 31, 1965. Moreover, petitioner was compelled to contribute $30,000 to Motors' capital in 1964 due to Ford's determination in that year that Motors' capital was impaired. Motors' operating deficit for 1964 was $47,550.51, and its retained earnings account as of December 31, 1964, had a deficit of $31,043.67. This compares with a surplus retained earnings account of $16,506.84 as of December 31, 1963. In addition, Motors was in arrears in its rent payments to Realty in the amount of $15,427.58 as of December 31, 1965. Motors ultimately reduced this unpaid rent account to approximately $8,400 pursuant to its transfer of land worth approximately $7,000 to Realty during 1966. Finally, Motors continued to operate at a loss during the period from January 1, 1966, through May 31, 1966. Prior to the sale of its assets on May 31, 1966, Motors lost approximately $15,000. In this context, petitioner advanced an additional $24,000 to Motors on January 10, 1966. After analyzing carefully the various transactions that occurred on April 1, 1965, and the details pertaining to Motors' continued financial problems, we *238 are convinced that Realty's transfer of $60,000 to Motors primarily benefited petitioner and not Motors. Petitioner, with his banking, business, and law 11 school background, is a sophisticated businessman and clearly understands financial realities. Petitioner could not have reasonably ignored the fact that subsequent to 1957 Motors continued to operate at a deficit.Moreover, petitioner was well aware that despite his infusion of $30,000 into Motors' working capital in 1964 at Ford's insistence, Motors' operating deficit for 1964 of $47,550.51 exceeded its operating deficit for 1963, and it retained earnings account declined from a surplus amount of $16,506.84 as of December 31, 1963, to a deficit amount of $31,043.67 as of December 31, 1964. Based on these facts, and in the absence of corroborated contrary evidence, we cannot accept petitioner's argument that Realty's transfer of funds to Motors on April 1, 1965, was motivated by the business reason of preserving Motors as a viable tenant. We have instead concluded that petitioner realized on or before April 1, 1965, that Motors' economic future was hopeless. Accordingly, Realty's transfer of $60,000 to Motors was merely *239 an attempted device to enable petitioner to extract $60,000 from Realty at no tax cost to petitioner in order to satisfy petitioner's $60,000 obligation to First National. Therefore, since the intercorporate transfer was designed to benefit primarily petitioner, all the related transactions occurring on April 1, 1965, and April 2, 1965, should be substantively collapsed to reflect that Realty, in effect, paid $60,000 to First National to discharge petitioner's obligation to First National. See Blueberry Land Company v. Commissioner, 361 F.2d 93 (C.A. 5 12 1966), affirming 42 T.C. 1137 (1964); Thomas F. Abbott, Jr. v. Commissioner, 342 F.2d 997 (C.A. 5, 1965), affirming a Memorandum Opinion of this Court. Accordingly, the Rushing rationale operates to impose constructive dividend consequences on petitioner with respect to the $60,000 item. Petitioner has attempted to controvert this conclusion by his testimony and the testimony of his accountant. Petitioner testified that he was advised by a bank that the Realty property that was mortgaged to produce the $100,000 loan to Realty should be "placed under an umbrella." However, there is no *240 testimony or other evidence that petitioner was also advised to have Realty loan $60,000 of the $100,000 to Motors. Therefore, in light of Motors' financial adversities, we cannot conclude that Realty's loan to Motors was precipitated by a valid business reason. In this context, we could have found a valid business reason if petitioner had introduced evidence to the effect that a bank would have infused capital into Motors but first required that Motors $60,000 loan to petitioner be eliminated. This would have provided some justification for the intercorporate transfer. However, the record is void of any evidence that would support this determination. With respect to the accountant's testimony, he attempted to justify the business validity of the April 1, 1965, intercorporate transfer by testifying that the futility of Motors' economic future did not become apparent until the taxable year 13 1966. We are not convinced by this testimony. The accountant's testimony merely signifies that he made an arbitrary mechanical decision in 1966 to reflect Motors' economic hopelessness in its accounting statements. We cannot infer from this testimony that petitioner also concluded *241 in 1966 that Motors' economic potential was futile. To the contrary, petitioner never consulted with his accountant pertaining to the potential disposition of Motors. [1] Petitioner was fully aware of Motors' economic condition. Motors' economic deterioration was not a sudden occurrence, but was instead the composite result of an unalterable decline commencing in 1958. Therefore, in view of Motors' adverse financial performance history, we believe that petitioner had concluded on or before April 1, 1965, (i.e., the date of Realty's purported loan to Motors) that Motors' economic future was futile, and that the accountant's conclusion in 1966 as to Motors' economic hopelessness merely confirmed petitioner's prior determination to this effect. Finally, petitioner's advance of $24,000 to Motors in January 1966 also is consistent with our conclusion. Since petitioner could not sell Motors until Ford located an appropriate *242 purchaser, petitioner was forced to maintain Motors as 14 an operating entity until a Ford-approved purchaser had been located. Since the record does not establish otherwise, we can only assume that petitioner had no alternative but to advance needed operating capital to Motors in January 1966 to permit continued operation of Motors until the consummation of Motors' sale. Motors' need for the $24,000 is supported by the fact that Motors sustained a $15,000 operating deficit between January 1, 1966, and May 31, 1966. The second issue for disposition involves the question whether Realty's advance of $33,000 to petitioner on April 1, 1965, constituted a valid loan, as contended by petitioner, or a constructive dividend to petitioner, as contended by respondent. Respondent's determination that the advance constituted a distribution taxable as a dividend is presumed to be correct. Rule 32, Rules of Practice, United States Tax Court; Welch v. Helvering, 290 U.S. 111 (1933); and Hord v. Commissioner, 143 F.2d 73 (C.A. 6, 1944), affirming a Memorandum Opinion of this Court. Whether the advance represented a bona fide loan or a dividend distribution *243 is a question of fact to be determined upon consideration of all the facts and circumstances in the case at bar, and depends upon the intent of the parties at the time the advance was made. Berthold v. Commissioner, 404 F.2d 199 (C.A. 6, 1968), affirming a Memorandum Opinion of this Court; Clark v. Commissioner, 266 F.2d 698 (C.A. 9, 1959), 15 affirming on this issue a Memorandum Opinion of this Court; Walter K. Dean, supra; William C. Biard, 25 T.C. 387 (1955); Carl L. White, 17 T.C. 1562 (1952); and Ben L. Meyer, 45 B.T.A. 228 (1941). Since intent is an intangible state of mind, we are required to examine all relevant circumstantial factors in order to determine the parties' true intent and purpose in making the advance in issue. See Walter K. Dean, supra, at 43-44. A close examination of the record has convinced us that the advance did not constitute bona fide indebtedness. The purported loan was unsecured and provided for no interest payments. The most significant factor, however, that influenced our determination was petitioner's attitude toward the advance. Although the purported *244 note was a demand note, and although petitioner's net worth would have permitted repayment of the note at any time, petitioner made only a nominal $1,000 payment on the purported note during the 5-1/2 year interval between the execution of the purported note and the date of the hearing. In response to the query why he had not repaid the note in full, petitioner stated as follows: "Well, I didn't think it was necessary. I'd pay it tomorrow if I * * * ." Subsequent to this testimony, petitioner further testified that he did intend to repay the advance but implied that he would do so at his convenience. In addition, petitioner elaborated on redirect examination that his repayment of the advance was, in effect, 16 contingent upon Realty's "need" for the money and that the $1,000 payment on the purported note was made to enable Realty to pay a tax assessment. Petitioner, Realty's sole shareholder, was the brain of Realty's corporate body and, as such, he was the sole determinant of Realty's corporate actions. Petitioner's casual attitude in dealing with Realty with respect to the $33,000 advance indicates that petitioner regarded Realty as being merely a corporate extension of *245 himself and not as being a bona fide creditor. Petitioner's intent to repay the demand note for these funds only when personal convenience and/or Realty's need precipitated such action, particularly when viewed in conjunction with his extraction of these funds from Realty without security and without interest, clearly establishes that petitioner did not consider the advance as being a binding obligation. Accordingly, since petitioner did not intend for the $33,000 advance to constitute a valid debt, he is not entitled to treat the advance as a debt for Federal income tax purposes. See Estate of Taschier v. United States, 440 F.2d 72 (C.A. 3, 1971); and Berthold v. Commissioner, supra.
In reaching this conclusion, we considered petitioner's references to the existence of a formal note and to petitioner's ability to repay the purported note at all times subsequent to its execution. We are not persuaded by these factors. These factors are neither individually nor collectively conclusive, 17 but are merely evidentiary factors to be considered in making an ultimate determination. See Walter K. Dean, supra, at 44; and Taschler, supra, at 76 and 77. *246 We believe that the record as a whole negates the factors raised by petitioner and supports our conclusion that Realty's $33,000 advance to petitioner did not constitute bona fide indebtedness, but instead constituted a distribution taxable as a dividend. Petitioner's final argument is a generalized reliance upon the doctrine of "net economic effect." Petitioner argues in effect that Motors' ultimate economic collapse diminished the net worth of both petitioner and Realty, and that, therefore, the $60,000 intercorporate transfer and the $33,000 advance did not result in an economic profit to petitioner. Petitioner's reliance on this doctrine is misplaced. The net economic effect of the $60,000 intercorporate transfer and the $33,000 advance was to enable petitioner to acquire $93,000 for his personal usage and benefit. These are the only transactions in issue. The losses resulting from the collapse of Motors are not before us at this time. Thus, the fact that petitioner's net worth may have been effectively diminished by the economic collapse of Motors does not alter the reality that the intercorporate transfer and the $33,000 advance, which are the only transactions with which *247 we are concerned, did result in a net economic benefit to petitioner. Decision will be entered for the respondent. Footnotes
1. On direct examination, petitioner's accountant testified as follows: Q Did Mr. McLemore ever discuss with you his reasons or the possibilities, even, of selling the assets of Motors? A Mr. McLemore never had any specific [discussion] with me, no. ↩