JOHN T. MILLS AND PRISCILLA L. MILLS, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Mills v. Commissioner
Docket No. 14629-81, 14630-81, 2879-82.
United States Tax Court
T.C. Memo 1986-94; 1986 Tax Ct. Memo LEXIS 515; 51 T.C.M. (CCH) 583; T.C.M. (RIA) 86094; March 10, 1986; REVERSED February 16, 1988 G. Gray Wilson,James M. Iseman, Jr., for the petitioners. Gary F. Walker, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: In these consolidated cases, respondent determined that deficiencies in income taxes are due from petitioners as follows: Taxable
Petitioners
Year Ended
Deficiency
John T. Mills and
Priscilla L. Mills
12-31-76
$301,080.00
Docket No. 14629-81
Ellis Hosiery Mills,
Inc.
3-31-78
$ 96,000.00
Docket No. 14630-81
Ellis Mills and
Anne D. Mills
12-31-76
$345,149.43
Docket No. 2879-82
After concessions, the issues remaining for decision are: (1) whether petitioner, Ellis Hosiery Mills, Inc., is entitled to deduct as a bad debt in 1978 the balance of $200,000 due on a $500,000 transfer made in 1976 *516 by Ellis Hosiery Mills to Lake Hickory Double Knit, Inc., a related corporation; and (2) whether the transfer in 1976 constituted a constructive dividend to petitioner, John T. Mills. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations and exhibits associated therewith are incorporated herein by reference. Petitioner, Ellis Hosiery Mills, Inc. (EHM), a North Carolina corporation, had its principal place of business in Hickory, North Carolina, at the time its petition was filed. Its Federal income tax return for the fiscal year ended March 31, 1978 was filed with the Internal Revenue Service Center, Memphis Tennessee. Petitioners, John T. and Priscilla L. Mills, husband and wife, resided in Hickory, North Carolina, at the time their petition was filed. Their joint income tax return for the calendar year 1976 was also filed with the Internal Revenue Service Center in Memphis. Petitioners, Ellis and Anne D. Mills, husband and wife, also resided in Hickory when their petition was filed. They, too, filed a joint income tax return for the calendar year 1976 with the Memphis Service Center. During the taxable years under consideration *517 and for some time prior thereto, Ellis Mills and his son, John T. Mills, were engaged in the hosiery business, primarily through EHM and four other corporations known as Ellis Hosiery Mills Sales Company, Inc. (EHM Sales); Mills Yarn, Inc. (MY); Winchester Hosiery Mills, Inc. (WHM); and Lake Hickory Double Knit, Inc. (LHD). Ellis Mills started the business which was later known as Ellis Hosiery Mills in 1936. He incorporated it as EHM in 1947. This corporation was primarily engaged in the manufacture of greige goods, an unfinished and undyed knitted material, used in the manufacture of hosiery. Ellis Mills was the president of EHM from its incorporation until his retirement in 1978. During the years 1972 through 1978 EHM had outstanding two classes of stock, i.e., preferred stock, all of which was owned by Ellis Mills, and common stock, all of which was owned by John T. Mills. The common stock had voting rights, but the preferred stock did not. On March 31, 1976, and March 31, 1977, EHM had retained earnings in the respective amounts of $1,347,107.33 and $1,425,726.56. Its taxable income was $84,648.59 for fiscal 1976 and $101,386.62 for fiscal 1977. Ellis Hosiery Mills *518 Sales Company was founded by Ellis Mills in 1942 and was incorporated by him as EHM Sales in 1975 under the laws of the State of New York. During the years 1972 through 1978, EHM Sales was a wholly-owned subsidiary of EHM and as sales agent marketed all products manufactured by EHM. Ellis Mills and John T. Mills were its president and vice president, respectively. MY was incorporated by Ellis Mills in 1955 under the laws of the State of North Carolina. During 1972 through 1978 Ellis Mills was the president of MY and its outstanding stock was owned as follows: Stockholders
Shares
Percent
Ellis Mills
259
60%
Unrelated Parties
171
40%
TOTAL
430
100%
During the years 1972 through 1978, MY was engaged in the business of texturing nylon in order to give it stretch characteristics. The textured nylon was then sold by MY primarily to EHM. WHM was incorporated by John T. Mills in 1964 under the laws of the State of Virginia, and during 1972 through 1978 he was its president. Its outstanding stock was owned as follows: Stockholders
Shares
Percent
John T. Mills
550
68.75%
Ellis Mills
125
15.63%
Ellis Mills, Jr.
5
.62%
Unrelated Parties
120
15.00%
TOTAL
800
100.00%
*519 WHM was engaged in the business of manufacturing greige goods for resale. LHD was also a North Carolina corporation. All of its outstanding stock was acquired in 1971 by WHM. LHD remained a wholly-owned subsidiary of WHM until LHD was liquidated at the end of 1977. John T. Mills was the president of LHD throughout this period. From about 1971 through 1978 the five corporations described above were under the complete dominion and control of Ellis Mills and John T. Mills, who together or separately were responsible for all of the corporate acts of each of the five companies. During this period each of the five corporations dealt extensively with nonrelated entities. However, during the same period the corporations carried on for the Mills family an integrated hosiery business. The integration as a form of business was adopted and used by the corporations because Ellis Mills and John T. Mills knew that to maximize profits in the hosiery business it was necessary to control the product from the raw material to the market place. In an attempt to accomplish this goal, Ellis Mills and John T. Mills anticipated that their five corporations would be utilized in such a manner as *520 to control their hosiery business from the manufacture of the yarn through the knitting, dying, doubling, folding, and selling of the finished hose. In actual operation under the integration each of the corporations provided services to and was the recipient of services from the other four corporations. For instance, beginning on February 26, 1971 and ending on January 4, 1972, EHM transferred $419,439.36 to LHD by a series of 16 separate transactions. These transfers were made so that both of the corporations involved could expand into the double-knit polyester market. Each of these transfers was represented by a demand note bearing interest from four percent to six percent and all of the notes were repaid with interest by February 28, 1973. Again, on June 29, 1973, EHM advanced $8,000 to LHD. This advance was also represented by a demand note bearing interest at six percent and was repaid with interest by September 30, 1974. During 1974 and 1975 LHD provided factoring services to EHM for approximately $700,000 worth of business with W.T. Grant Company, the largest customer of EHM. During 1975 and 1976 EHM Sales provided sales, logo, and advertising services to LHD for its *521 double-knit business. In addition to the sums advanced by EHM, LHD arranged several other loans from independent financial institutions. The schedule below reflects the year, amount, interest rate, and security applicable to such loans: Fiscal Year Ended
Amount
Interest
Security
9-30-71
9-30-72
$ 42,371.64
8%
Equipment
$116,359.56
8%
Equipment
9-30-73
$ 71,645.00
Prime rate
Equipment
plus 3%
9-30-74
$ 24,500.00
Prime rate
Equipment
plus 3%
9-30-75
$ 25,419.60
12%
Equipment
$ 17,887.93
12%
Equipment
9-30-76
9-30-77
$ 1,121.18
9%
EHM Stock
$ 1,556.11
12%
Equipment
$ 18,347.64
10.5%
Equipment and
Real Estate
LHD's venture into the double-knit business did not prosper. By 1976, the industry was bottoming out and LHD reported a loss for the fiscal year of $134,620.77 and on September 30, 1976, LHD owed MY $525,775.56 for raw materials. To allay the anxiety which this large unpaid account aroused among MY's minority shareholders and to maintain harmony in its integrated business, EHM agreed to transfer $500,000 to LHD so that the account could be paid. The transfer was made by EHM to LHD on *522 September 30, 1976. It was not represented by a promissory note or any other evidence of an unconditional promise to repay the sum advanced. With the transferred funds, LHD paid the MY account and MY in turn repaid $500,000 of the funds which it had previously borrowed from EHM. The accounting records of the three companies reflect (1) that on September 30, 1976 the $500,000 was advanced by EHM to LHD as a loan, (2) that on the same date LHD paid the $500,000 on the account payable which it had it with MY, and (3) that on the same date MY paid the $500,000 on its loan payable to EHM. As a result, the $500,000 passed on the same day from EHM to LHD, from LHD to MY, and from MY back to EHM. Late in 1977 Ellis Mills and John T. Mills decided to enter the girls' knee-high hosiery business through the use of EHM, to transfer sufficient personnel to support this line of hosiery from LHD to EHM, and to completely liquidate LHD as of December 31, 1977. In accordance with this decision LHD's assets were transferred to WHM in exchange for the assumption by WHM of all of LHD's liabilities with the exception of the balance of $475,000 [2] which was then due on the $500,000 "indebtedness" *523 to EHM. WHM agreed to assume and pay only $275,000 in full settlement of this account. However, all other debts of LHD to nonrelated creditors were fully satisfied by WHM, leaving outstanding only the $200,000 due EHM which EHM deducted as a bad debt on its income tax return for the year ended on March 31, 1978. Respondent disallowed the bad debt deduction claimed by EHM and determined that the transfer was, in reality, a constructive dividend in 1976 to John T. Mills or, in the alternative, a constructive dividend in 1976 to Ellis Mills. However, on brief respondent has conceded that the transfer was not a constructive dividend to Ellis Mills. OPINION Respondent contends that EHM is not entitled to a bad debt deduction under section 166 because the original transfer of the $500,000 from EHM to LHD did not constitute a bona fide loan but instead was a constructive dividend from EHM to John T. Mills, the owner of all of its common stock, and a contribution by him to the capital of LHD, the wholly owned subsidiary *524 of WHM, another corporation which was controlled by John T. Mills through his ownership of nearly 69 percent of its stock and another 16 percent of the stock which was owned by his father and his brother. Petitioners insist that the transfer was a bona fide loan and did not constitute a dividend. It is well established that a transfer between related corporations can constitute a constructive dividend to the common shareholder if the transfer was made primarily for his benefit and if it results in a direct or tangible benefit to him. ; ; . On the other hand, if the disputed transfer constitutes a bona fide loan or if the benefit to the common shareholder is only indirect or derivative in nature there is no dividend. Whether the transfer is a bona fide loan and the nature of the benefit to the common shareholder are factual issues which must *525 be determined from a consideration of all of the circumstances and with the burden of proof being upon petitioners. ;
The key question in determining whether or not there was a bona fide loan is whether the parties to the transfer had a genuine intention to create a debt. Furthermore, the resolution of the key question must be determined by weighing objective factors such as the economic reality of the claimed relationship and the presence or absence of a reasonable expectation of repayment of the purported debt. The stated intention of the parties is not sufficient unless supported by objective factors indicating that the transaction had economic reality. ;; . We find that petitioners' arguments in these cases that the transfer constituted a bona *526 fide loan are not persuasive for the following reasons: (1) The testimony of John T. Mills and Ellis Mills as the principal officers and controlling stockholders of EHM, the transferor of the funds, and LHD, the transferee, to the effect that the transfer was intended by both parties as a loan is not sufficient because such testimony is not supported by the objective factors present in these cases. First, at the time the transfer was made and for several years prior thereto John T. Mills and his father Ellis Mills had admittedly controlled, managed, and operated all five of the family corporations as a single integrated hosiery business with the idea of controlling the manufacture and sale of their product. Consequently, because of the rigid family control any transaction between two of the corporations is subject to scrutiny. Secondly, the transaction involved in this case does not have any of the usual characteristics of a loan. It was not represented by a promissory note. There was no provision made for the payment of interest or of a schedule for the repayment of the principal. All of these contemporaneous factors tend to establish that there was no unconditional obligation *527 by LHD to repay the amount advanced and such factors are entitled to more weight than the testimony of the parties as to their intent. [3]; . (2) Petitioners' contention that the intent to treat the transfer as a loan is clearly reflected by the manner in which EHM and LHD handled the transaction on their accounting records is not convincing because "consistent bookkeeping and consistent financial reporting on balance sheets are * * * little more than additional declarations of intent, without any accompanying objective economic indicia of debt." . See also . (3) Under all of the circumstances involved in this particular case we are not convinced that even a partial repayment of $300,000 is indicative that the original $500,000 transaction was a genuine debt. This is true because in the 15 months prior to the *528 liquidation of LHD only $25,000 had been paid to EHM.Furthermore, any favorable inference which might be drawn from the repayment of the additional $275,000 upon the liquidation of LHD is considerably diminished by the fact that it was generated by another transaction between related companies which at best is subject to close scrutiny because the purchaser agreed to pay all the other creditors in full while paying EHM only $275,000 on an alleged debt totaling $475,000. Under these circumstances we are unable to agree with petitioners that the $275,000 transaction between WHM and EHM had any bearing whatsoever on the genuineness of the debt which was allegedly created between LHD and EHM 15 months previously. (4) From the record before us we are unable to conclude that EHM, the alleged lender of the $500,000, had any corporate business purpose for making the transfer to LHD. The presence or absence of such a purpose by the corporate transferor is another factor to be considered. . In fact, from the record as a whole, it is apparent *529 that the transfer was made because LHD (a corporation indirectly owned and controlled by John T. Mills through WHM) was so undercapitalized that it could not satisfy an account payable to MY (a corporation controlled by Ellis Mills through his 60 percent of its stock) and whose minority shareholders were upset and disturbed by the unpaid account. The transfer permitted LHD to make a $500,000 payment on the account and MY used the same funds on the same date to pay $500,000 which it owed to EHM. The end result to EHM was an exchange of a receivable from MY for an equal receivable from LHD. We are at a loss to see how the exchange served any corporate purpose for EHM. . (5) We are also unable to agree with petitioners' contention that John T. Mills did not realize any benefit from the transfer of funds. To the contrary, the record as a whole clearly establishes that John T. Mills was able to use monies belonging to EHM (a corporation controlled by him) to provide funds to LHD, an uncapitalized wholly-owned subsidiary of WHM (another corporation controlled by him), which monies LHD immediately used to make a substantial *530 payment on an account payable to MY, a corporation controlled by the father of John T. Mills, but whose minority shareholders were disturbed by the unpaid account to the point where it constituted a threat to the operation of the family's integrated hosiery business. As part of the same transaction, MY used the funds to repay a loan payable to EHM. By means of this scheme, John T. Mills managed to at least temporarily overcome the capitalization problems of LHD without making any capital contribution either directly to LHD or indirectly through its parent, WHM. Furthermore he accomplished it without incurring any personal interest expense, encumbering any personal capital, or reducing his personal credit. The result was an obvious, direct benefit to John T. Mills and to his family's integrated hosiery business.Just as obviously as pointed out previously it served no corporate business purpose for EHM. *531 In view of all of the foregoing, we conclude that the transfer in 1976 of the $500,000 from EHM to LHD did not constitute a bona fide loan, but instead was a constructive dividend from EHM to John T. Mills. Consequently, EHM is not entitled to a bad debt deduction in 1978. Decisions will be entered under Rule 155 in Docket No. 14629-81 and Docket No. 14630-81.
Decision will be entered for petitioner in Docket No. 2879-82.
Footnotes
1. Cases of Ellis Hosiery Mills, Inc., docket No. 14630-81; and Ellis Mills and Anne D. Mills, docket No. 2879-82, were consolidated herewith for trial, briefing and opinion.↩
2. LHD had previously paid $10,000 to EHM in March 1977, and $15,000 in June 1977, which had been applied to the $500,000 transfer leaving the $475,000 balance.↩
3. In the past we have sometimes minimized the importance of the absence of a promissory note or other formal instrument of debt or even the absence of interest. See , affg. on this issue a Memorandum Opinion of this court. We believe, however, that the absence of such factors in this case is important because they are inconsistent with the manner in which loans between the related corporations had been handled in the past and especially with the manner in which loans had been handled by the corporations with outside institutions.↩