**John T. MILLS; Priscilla T. Mills; Ellis Hosiery Mills, Inc., Petitioners–Appellants,**

v.

**INTERNAL REVENUE SERVICE, Respondent—Appellee.**

**No. 86–2598.**

United States Court of Appeals, Fourth Circuit.

Argued March 3, 1987.

Decided Feb. 16, 1988.

G. Gray Wilson (James M. Iseman, Jr., Timothy J. Ehlinger, Petree, Stockton & Robinson, Winston–Salem, N.C., on brief), for petitioners-appellants.

Roger M. Olsen, Asst. Atty. Gen. (Michael L. Paup, Ann Belanger Durney, Nancy G. Morgan, Washington, D.C., on brief), for respondent-appellee.

Before WIDENER and SPROUSE, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

HAYNSWORTH, Senior Circuit Judge:

This tax controversy arose out of the transfer by one corporation to a related corporation of $500,000, only $300,000 of which was repaid. Upon an audit of the income tax return of the transferor, the Commissioner disallowed a claimed bad debt deduction for the uncollected $200,000 upon the theory that the transfer of the $500,000 had not created a creditor-debtor relationship but was a contribution to the capital of the transferee. In apparent recognition of the fact that there was never any intention that the transferor should acquire an equity position in the transferee, the Commissioner assessed the entire $500,000 as a constructive dividend to the founder of the transferor, the owner of all of its preferred stock. At the same time, the Commissioner assessed the entire $500,000 as a constructive dividend to the founder's son who, by then, had succeeded his father as president of the transferor and had become the owner of all of its

outstanding common stock. This resulted in asserted deficiencies against Ellis Hosiery Mills, the transferor, of $96,000, against Ellis Mills and his wife of $345,-149.43, and against John T. Mills and his wife of $301,080.

Before the Tax Court, the Commissioner conceded the case against Ellis Mills, the founder and preferred stockholder of the transferor, but was sustained by the Tax Court in its assertion of income tax deficiencies against Ellis Hosiery Mills and against John T. Mills and his wife. 51 T.C.M. (CCH) 583 (1986).

Upon the appeals of the taxpayers, we reverse.

## I.

In the 1930's, Ellis Mills established a business, finally incorporated in 1947 and known as Ellis Hosiery Mills. It was a producer of greige goods for hosiery. Ellis Mills was the president of Ellis Hosiery until his retirement in 1978, when he was succeeded as president by his son, John T. Mills. By 1975, Ellis Mills had become the owner of all the preferred stock of Ellis Hosiery, while John had become the owner of all the common stock of Ellis Hosiery.

Ellis Hosiery Mills Sales Company was formed by Ellis Hosiery in 1942 to handle the selling of the products of Ellis Hosiery. In 1975 the sales company was incorporated as a wholly owned subsidiary of Ellis Hosiery.

Mills Yarn, Inc. was incorporated in 1955 to engage in the business of texturing synthetic yarns to give them elasticity. It sold its products to Ellis Hosiery and to others. Ellis Mills was the owner of 60 percent of the outstanding stock of Mills Yarn, while the remaining 40 percent of the stock of Mills Yarn was owned by unrelated stockholders.

In 1964, John Mills, with the support and active participation of his father, established Winchester Hosiery Mills to produce hosiery greige goods in Virginia, though its production facilities were later moved to Hickory, North Carolina, the home of Ellis Hosiery. John Mills owned 68.75 percent of the stock of Winchester Hosiery/Ellis Mills and Ellis Mills, Jr., collectively, owned 16.25 percent of that stock, while the remaining 15 percent was owned by unrelated stockholders.

Lake Hickory Double Knit was established by the Mills, father and son, in 1970 to engage in the production of double knit fabrics. It soon became a wholly owned subsidiary of Winchester Hosiery.

There is no doubt but that the father and son were convinced that the more integrated a hosiery business, from raw material to finished products on the retail shelves, the greater its profitability. From the outset of their venture into the double knit business, it was contemplated that Lake Hickory would purchase its yarn from Mills Yarn, while it and related corporations would process and handle the material through final sales by Ellis Hosiery Sales. Double knit fabrics were new and in demand, and the business appeared to be a promising one.

Lake Hickory was launched with an initial capital contribution of $55,000. Ellis Hosiery, however, provided financial support, as it had both to Winchester and Mills Yarn. From February 26, 1971 through January 4, 1972, Ellis Hosiery made 16 advances to Lake Hickory aggregating $419,439. There was a repayment of $53,-750 on March 1, 1971, and another repayment of $10,000 on March 8, 1971, but by January 4, 1972, the outstanding balance had reached $355,689.36.

No one of these advances was evidenced by a contemporaneously executed promissory note. There was no written loan agreement. They were simply open advances, evidenced only by appropriate entries in the books of Ellis Hosiery and of Lake Hickory. At least in some instances, they were recorded as notes receivable and notes payable rather than as accounts receivable and accounts payable, apparently to distinguish them from current accounts, but there were no written notes.

By January 1973, Lake Hickory was realizing a positive cash flow that permitted it to begin repayment of these advances. Repayment installments began on January 4,

1973. During the months of January and February 1973, there were eight payments by Lake Hickory to Ellis Hosiery that, collectively, completely repaid the outstanding balance of $355,689.36, outstanding as of January 4, 1972.

For the next three years, Lake Hickory stood upon its own financial feet. Then the demand for Lake Hickory's double knit fabrics seriously waned. It fell behind in its payments upon its open account with Mills Yarn for yarn purchased. In September 1976, the unpaid balance of that open, running account reached $500,000, and the independent stockholders of Mills Yarn became concerned about the condition of the account, so concerned, that the Mills, father and son, felt constrained to do something about it. With respect to the independent stockholders of Mills Yarn, Ellis Mills, of course, was in something of a fiduciary position. He could not neglect the financial interest of Mills Yarn, but an aggressive attempt by Mills Yarn to procure full payment from Lake Hickory would threaten the integrated enterprise. Lake Hickory was suffering from a decline in the demand for its product, but, to the Mills, in the long run, the double knit business still seemed quite promising. Moreover, John Mills testified that the independent stockholders of Mills Yarn knew that Ellis Hosiery had provided financial support for Lake Hickory, as it had done, and was still doing, for Mills Yarn. He did not suggest that Ellis Hosiery was an actual guarantor of payment by Lake Hickory of its open account indebtedness to Mills Yarn, but he thought that the independent stockholders of Mills Yarn might reasonably expect Ellis Hosiery to provide the financial support necessary to secure that payment.

Meanwhile, Mills Yarn had been the recipient of substantial financial support from Ellis Hosiery. There were 19 advances by Ellis Hosiery to Mills Yarn from August 20, 1963 to September 30, 1975. From time to time there were repayments, so that the outstanding balance was reduced to zero on March 27, 1964, and again on August 30, 1969. However, the outstanding balance reached $616,000 on February 28, 1973, and $691,000 on January 30, 1974. In September 1976, the outstanding principal balance was $500,000.

On September 30, 1976, Ellis Hosiery made an advance of $500,000 to Lake Hickory. Lake Hickory, in turn, delivered its check for $500,000 to Mills Yarn to bring its purchase account current, while Mills Yarn issued its check to Ellis Hosiery to repay the outstanding balance of its indebtedness to Ellis Hosiery.

In addition to the $500,000 paid by Mills Yarn to Ellis Hosiery in repayment of the outstanding principal balance of its account, it also paid interest. There was testimony that because 40 percent of the stock of Mills Yarn was owned by unrelated stockholders and Mills Yarn was not in a brother-sister relationship with Ellis Hosiery, it was thought fair and appropriate to require interest payments from Mills Yarn, though no such payments were required of Winchester and Lake Hickory.

Lake Hickory required no further advances from Ellis Hosiery. Instead, on March 31, 1977 and on June 2, 1977, it was able to make two small repayment installments to Ellis Hosiery, reducing its outstanding balance from $500,000 to $475,000. The anticipated improvement in the double knit business had not fully materialized by late 1977, however. Meanwhile, girls' textured knee-high socks came in great demand. Mills Yarn retained a designer who designed a line of such socks, and a decision was made to redeploy the personal and the tangible resources that had been engaged in the double knit business in order that Ellis Hosiery might enter the girls' knee-high sock business. Then came a decision to liquidate Lake Hickory.

There was an appraisal of Lake Hickory's assets which indicated that the realizable value was less than Lake Hickory's total indebtedness. Winchester, Lake Hickory's parent corporation, was willing to assume and agree to repay Lake Hickory's debts upon a distribution of Lake Hickory's assets, but only to the extent that the aggregate amount of the assumed debts did not exceed the value of the assets. The

difference was determined to be approximately $200,000. In these circumstances, it was determined that Winchester should completely assume Lake Hickory's indebtedness to third persons, but only $275,000 of its total indebtedness to Ellis Hosiery of $475,000. That proposition was accepted by Ellis Hosiery, and on December 31, 1977 it received a payment of $275,000 from Winchester. It was the $200,000 shortfall that Ellis Hosiery undertook to deduct as a bad debt loss.

## II.

There is no substantial dispute about the governing legal principles to be applied in each branch of the case. The substantial questions go to the fact finding of the Tax Court. We reverse, since we conclude that the findings of the single Tax Court judge are clearly erroneous.

## A.

■ Whether the $500,000 transfer from Ellis Hosiery to Lake Hickory was debt for which repayment was expected depends upon the intention of the parties. *Road Materials, Inc. v. Commissioner*, 407 F.2d 1121 (4th Cir.1969); *Gilbert v. Commissioner*, 74 T.C. 60 (1980). It was debt, not a contribution to the capital of Lake Hickory, if that was the intention of Ellis and John Mills. Of course, the testimony was that it was intended to create a genuine obligation of repayment, and that testimony is supported by the contemporaneous entries in the books of the two corporations, where the transaction was treated as having created an account receivable by Ellis Hosiery and an account payable by Lake Hickory. It is further supported by the fact of early repayment of $25,000. That amount is only a small portion of the total advance, but if the transfer did not create genuine debt, no repayment of any amount was due or expected. It is most emphatically supported by the long history of intercorporate advances on open accounts, all of which had been completely repaid.

The Tax Court judge was impressed by the absence of the formal trappings that ordinarily would accompany a loan by an independent financial institution. There was no note or formal written loan agreement. There was no fixed repayment schedule and no requirement of contributions to a sinking fund.

Inquiry into the presence of such things may provide useful guides in the context of transactions between unrelated parties. In the context of this intercorporate transfer between related corporations, the only possible thing of relevance was the absence of a written note. Related corporations, such as these, simply do not provide for sinking funds appropriately required of some issuers of publicly held bonds. Nor do they ordinarily set up fixed repayment schedules appropriately required of consumer borrowers. The advances from Ellis Hosiery were intended to bolster Lake Hickory's financial situation, not to confine it. Assuming that repayment was expected and intended, it was neither expected nor intended except as Lake Hickory's positive cash flow enabled it to make repayments, and that cannot be accurately forecast in a fixed repayment schedule. The 16 earlier advances had been unrestricted, and the full repayment of the 16 advances strongly supports the testimony that repayment of the $500,000 was expected.

The Tax Court judge discounted the testimony of John Mills about the intention of the principals and the effect of the previous financial history because he found that each of the 16 earlier advances had been evidenced by a written, interest bearing promissory note. We can find no support in the record for such a finding. The only things remotely pointing in that direction were two footnotes in unaudited financial statements for Lake Hickory as of September 30, 1972 and September 30, 1973. In a list of notes payable as of September 30, 1972, there is listed a demand note to Ellis Hosiery Mills dated March 31, 1972 for $355,689.36 bearing four percent interest. The list of notes payable as of September 30, 1973 includes a note payable to Ellis Hosiery Mills for $8,000 dated June 29, 1973, bearing interest at six percent. In each year there were notes payable to third

parties properly included in the list of notes payable, but the inclusion of notes payable to Ellis Hosiery finds no other support in the record and, of course, is contradicted by the testimony of John Mills.

The outstanding balance due by Lake Hickory to Ellis Hosiery on March 31, 1972 indeed was $355,639.36, but that had been the balance outstanding since January 4, 1972. A note in that amount dated March 31, 1972 was not contemporaneous with the advance by Ellis Hosiery to Lake Hickory.

The open advances of Ellis Hosiery to Lake Hickory outstanding during most of 1972 were completely repaid in January and February 1973. On June 29, 1973, Ellis Hosiery had no open account credit balance with Lake Hickory. There was no such outstanding balance to be evidenced by a note. If there ever was a note for $8,000, it was unrelated to the history of financial support provided by Ellis Hosiery to Lake Hickory.

Since there was no other support in the record for a finding that each of the 16 advances was evidenced by a written, interest bearing note, we must conclude that the finding was clearly erroneous. Our conclusion, of course, is buttressed by the fact that the record contains no evidence of actual payments of interest by Lake Hickory to Ellis Hosiery.

The Tax Court judge also found that Ellis Hosiery had no business purpose in making a $500,000 advance to Lake Hickory in September 1976. The bare finding was unamplified, and it goes counter to the whole history of financial support provided by Ellis Hosiery to Mills Yarn, to Winchester, and to Lake Hickory. The whole concept of the integrated enterprise was one of mutuality of dependence and of service. From the outset it was contemplated that Lake Hickory would obtain its yarn from Mills Yarn; its double knit fabric would be finished by Ellis Hosiery, and the finished goods sold by Ellis Sales. The contemplated direct participation by Ellis Hosiery in the processing of Lake Hickory's fabrics was never fully consummated, but Lake Hickory's operations were a contemplated source of business for Ellis Hosiery. Of

more importance, perhaps, is the fact that Ellis Hosiery was very properly and necessarily concerned about the financial stability and financial reputation of the entire integrated enterprise. If Lake Hickory should provoke steps by Mills Yarn to collect its open account balance, the entire enterprise would have been put in some financial disrepute. The concerns of the independent stockholders of Mills Yarn would not have been met, and a default could have substantially affected the business reputation and the creditworthiness of the entire enterprise. In that enterprise, Ellis Hosiery was the anchor company. It was to have been expected that the burden of steps necessary to protect and preserve the good business reputation of the enterprise should fall first upon Ellis Hosiery.

Finally, the Tax Court thought it a matter of some significance that Winchester assumed, and actually paid, all of Lake Hickory's outside creditors but paid only $275,000 of the remaining balance of $475,000 on Ellis Hosiery's claim. This was said to have been inferior treatment of the claim of Ellis Hosiery, as, of course, it was, for there was no discounting of the claim of any other creditor.

A debt is nonetheless a debt, however, though it be subordinated to the claims of general creditors arising in the ordinary course of business. There was a substantial reason why the entire loss of $200,000 be absorbed by Ellis Hosiery, for it was a matter of great importance to all of the related corporations that their business and credit reputations be preserved and protected. A failure to offer full payment to all of the outside creditors could only have provoked controversy and probable litigation. Aside from the direct expense involved in the resolution of such controversies, the fact that outside creditors suffered losses would adversely affect the business and credit reputations of all of the related corporations. The financial health of the related enterprise as a whole might well have been viewed as much more seriously threatened by a default in making full payment to outside creditors than by

an absorption by Ellis Hosiery of a $200,-000 loss on its claim against Lake Hickory.

The Tax Court was too formalistic in its emphasis upon the absence of those financial requirements characteristic of extensions of credit by financial institutions to non-related borrowers. No single factor or set of factors is controlling. *John Kelley Co. v. Commissioner*, 326 U.S. 521, 530, 66 S.Ct. 299, 304, 90 L.Ed. 278 (1946). Essentially, each case must turn upon its own facts. *Slappey Drive Indus. Park v. United States*, 561 F.2d 572, 581 (5th Cir.1977).

Here, if one gives due credit to the history of the intercorporate advances by Ellis Hosiery to related corporate enterprises, including the invariable repayment in full of every other such advance, one can only conclude that this advance was intended to create a real debt, just as John Mills testified and just as every similar earlier advance had done.

The contrary finding of the Tax Court was clearly erroneous.

### B.

The Commissioner can fare no better on his claim that the transfer of the $500,000 was a constructive dividend to John Mills. The contention is premised upon the conclusion that the transfer did not create real indebtedness but was a contribution to capital, a conclusion we have already rejected. Quite apart from that, however, this transfer did not meet the criteria for the identification of a constructive dividend.

A transfer of funds or property by one corporation to another may be found to be a constructive dividend to a person who is a shareholder in both corporations if the primary purpose of the transfer was to benefit the individual stockholder and the transfer had that effect. *Biltmore Homes, Inc. v. Commissioner*, 288 F.2d 336, 340–41 (4th Cir.), *cert. denied*, 368 U.S. 825, 82 S.Ct. 46, 7 L.Ed.2d 30 (1961); *Stinnett's Pontiac Serv., Inc. v. Commissioner*, 730 F.2d 634, 640 (11th Cir. 1984); *Sammons v. Commissioner*, 472 F.2d 449, 451 (5th Cir.1972). Any transfer that benefits a corporation can be said indi-rectly to benefit the corporation's shareholders, but it is not a constructive dividend unless it benefits the shareholder in some direct way quite apart from his strictly derivative interest as a shareholder. Thus, where the purpose of the transfer is to enable the transferee to discharge an indebtedness for which the stockholder is personally liable, it may be a constructive dividend. *Cox v. Commissioner*, 56 T.C. 1270 (1971), *modified*, 58 T.C. 105 (1972). So it is if the purpose of the transfer is to enable the transferee to pay its debt to its stockholder. *Commissioner v. McLemore*, 32 T.C.M. 259 (1973), *aff'd*, 494 F.2d 1350 (6th Cir.1974). If the transfer is of taxable earnings by a taxable entity to a non-taxable corporation, treatment of the transfer as a constructive dividend to the common stockholder may be warranted. *Biltmore Homes, Inc. v. Commissioner*, 288 F.2d 336 (4th Cir.), *cert. denied*, 368 U.S. 825, 82 S.Ct. 46, 7 L.Ed.2d 30 (1961); *Equitable Publishing Co. v. Commissioner*, 356 F.2d 514 (3rd Cir.), *cert. denied*, 385 U.S. 822, 87 S.Ct. 50, 17 L.Ed.2d 60 (1966).

Nothing of that sort occurred here. There was no siphoning off of funds into the pockets of John Mills, or those of someone to whom Mills was indebted. There was no transfer of taxable but untaxed income. When there is no evasion of corporate income tax and the only benefit to the shareholder is indirect or derivative, transfers between closely related corporations are not constructive dividends to the common shareholder. *Joseph Lupowitz Sons, Inc. v. Commissioner*, 497 F.2d 862, 868–69 (3d Cir.1974); *Sammons v. Commissioner*, 472 F.2d at 451–52; *Commissioner v. Offutt*, 336 F.2d 483, 487–88 (4th Cir. 1964); *Rushing v. Commissioner*, 52 T.C. 888 (1969), *aff'd on other grounds*, 441 F.2d 593 (5th Cir.1971).

The Tax Court judge sought to bring this transfer within the rule by finding, in effect, that it discharged an obligation of John Mills to remedy a perceived under-capitalization of Lake Hickory. He found that John Mills received a direct and primary benefit for he was enabled to solve Lake Hickory's under-capitalization prob-

lem without redeployment of any of his personal assets or borrowing funds and incurring interest expense. The theory is inapplicable, however, for John Mills had no obligation to make a capital contribution to Lake Hickory or to Lake Hickory's parent, Winchester.

During the depression which afflicted the entire double knit industry, Lake Hickory was experiencing difficulty in keeping its accounts current, for it was absorbing losses. Lake Hickory had been launched with a relatively small initial capital contribution, but in its early years it had flourished with Ellis Hosiery's financial assistance and had been able to completely repay Ellis Hosiery's advances of more than $400,000. Its cash flow problem was a product of the recession in the double knit business.

If, however, the problem might be characterized as one of under-capitalization of Lake Hickory, John Mills individually had no obligation to remedy it. Because the independent stockholders of Mills Yarn may have relied upon the history of financial support by Ellis Hosiery, that corporation may have had a moral obligation to resume its financial support of Lake Hickory. There was no such obligation upon Lake Hickory's sole stockholder, Winchester, or upon Winchester's stockholders, including a substantial minority. Were it otherwise, the corporate law principle of limited liability would be meaningless, for an affluent majority stockholder would be required to make additional capital contributions to enable the corporation to pay its debts in full.

We discern no direct and primary benefit that the transfer conferred upon John Mills.

### III.

The decision of the Tax Court is reversed.

REVERSED.